No. 22-15824

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAN FRANCISCANS SUPPORTING PROP B, EDWIN M. LEE ASIAN PACIFIC DEMOCRATIC CLUB PAC SPONSORED BY NEIGHBORS FOR A BETTER SAN FRANCISCO ADVOCACY, AND TODD DAVID,

*Plaintiffs-Appellants*,

v.

DAVID CHIU, SAN FRANCISCO ETHICS COMMISSION, CHESA BOUDIN, AND CITY AND COUNTY OF SAN FRANCISCO,

*Defendants-Appellees*.

Appeal from the U.S. District Court for the Northern District of California
Honorable Charles R. Breyer
Civil Action No. 3:22-cv-02785-CRB

## BRIEF AMICUS CURIAE OF CAMPAIGN LEGAL CENTER IN SUPPORT OF DEFENDANTS-APPELLEES AND URGING AFFIRMANCE

Tara Malloy
Megan P. McAllen
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, D.C. 20005
Telephone: (202) 736-2200
tmalloy@campaignlegalcenter.org
mmcallen@campaignlegalcenter.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Campaign Legal Center is a non-profit organization organized under Section 501(c)(3) of the Internal Revenue Code. Campaign Legal Center neither has a parent corporation nor issues stock. There are no publicly held corporations that own ten percent or more of the stock of Campaign Legal Center.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMEN T** ........................................................i

**TABLE OF AUTHORITIES** ........................................................ iii

**STATEMENT OF INTEREST** ........................................................1

**SUMMARY OF ARGUMENT** ........................................................1

**ARGUMENT** ........................................................5

    I.  Electoral Disclaimer Laws Promote First Amendment Interests ..................6

    II. San Francisco's Disclaimer Requirement is Not Subject to Strict Scrutiny ........................................................10

        A. No court has analyzed campaign finance disclaimers under a compelled speech rubric ........................................................10

        B. San Francisco's disclaimer does not resemble the type of "compelled speech" that merits strict scrutiny review................................14

    III. The Challenged Disclosure Law Is Narrowly Tailored to San Francisco's Vital Interest in Promoting an Informed Electorate ......................................21

        A. The statute meets the exacting scrutiny standard that has long applied to electoral disclosure laws........................................................19

        B. The disclaimer requirement is substantially related to the important interest in facilitating informed voting........................................................23

**CONCLUSION**........................................................30

**CERTIFICATE OF COMPLIANCE** ........................................................31

**STATEMENT OF RELATED CASES**........................................................32

**CERTIFICATE OF SERVICE** ........................................................33

# TABLE OF AUTHORITIES

**Cases:**

*Alaska Right to Life Comm. v. Miles*, 441 F.3d 773 (9th Cir. 2006) ......................22

*ACLU v. Heller*, 378 F.3d 979 (9th Cir. 2004) ........................................................22

*Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021) .. 3-4, 20, 21

*Buckley v. Valeo*, 424 U.S. 1 (1976) .........................................................6, 7, 10, 11

*Cal. Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172 (9th Cir. 2007), 328
F. 3d 1088 (9th Cir. 2003) ...................................................................................22

*Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270
(4th Cir. 2013)................................................................................................ 28-29

*Citizens United v. FEC*, 558 U.S. 310 (2010)...................................................passim

*Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304
(3d Cir. 2015)........................................................................................................27

*Family PAC v. McKenna*, 685 F.3d 800 (9th Cir. 2012) .........................................27

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).................................. 1-2

*Gaspee Project v. Mederos*, 13 F.4th 79 (1st Cir. 2021) ......................4, 6, 8, 12, 19

*Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990
(9th Cir. 2010).........................................................................................6, 9, 11, 21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)..............................................................................12, 14, 15

*Independence Institute v. FEC*, 216 F. Supp. 3d 176 (D.D.C. 2016) ......................26

*Independence Institute v. Williams*, 812 F.3d 787 (10th Cir. 2016).......................26

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010).........................................................19

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014) ...............................................27

*Majors v. Abell*, 361 F.3d 349 (7th Cir. 2004).......................................................29

*Mass/Fiscal All. v. Sullivan*, No. 18-12119-RWZ, 2018 WL 5816344 (D.
Mass. Nov. 6, 2018).............................................................................................9

*McConnell v. FEC*, 540 U.S. 93 (2003)...........................................................*passim*

*McConnell v. FEC*, 251 F. Supp. 2d 176 (D.D.C. 2003)...................................24, 25

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ............................................................20

*Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102 (9th Cir. 2019),
    *cert. denied*, 140 S. Ct. 2825 (2020) ....................................................11

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) .........................................................16, 17, 18

*Nat'l Org. for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011) ...........................8, 9

*Regan v. Taxation With Representation of Wash.*, 461 U.S. 540 (1983) ...............22

*Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781 (1988).............................17

*Smith v. Helzer*, No. 3:22-CV-00077-SLG, 2022 WL 2757421 (D. Alaska
    July 14, 2022)...............................................................4, 12, 15, 24

*Van Hollen v. FEC*, 811 F.3d 486 (D.C. Cir. 2016) ..............................................27

*Van Hollen v. FEC*, No. 12-5117, 2012 WL 1758569
    (D.C. Cir. May 14, 2012)......................................................................27

*Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118 (2d Cir. 2014) ...................28

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008).........................................................................25

*Wooley v. Maynard*, 430 U.S. 705 (1977) ....................................................... 14-15

*Worley v. Fla. Sec'y of State*, 717 F.3d 1238 (11th Cir. 2013).........................21, 28

*Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015) .......................................7, 11, 27

*Yes on Prop B v. City & Cnty. of S.F.*, 440 F. Supp. 3d 1049
    (N.D. Cal. 2020), *appeal dismissed as moot*, 826 F. App'x 648 (9th Cir.
    2020) (unpublished) .........................................................................2, 7

**Statutes and Regulations:**

52 U.S.C. § 30104(f) ...............................................................................27

52 U.S.C. § 30104(f)(2)(E) ......................................................................27

Alaska Stat. § 15.13.090 ...........................................................................9

Cal. Gov't Code § 84503 ...........................................................................9

Conn. Gen. Stat. § 9-621(h) .......................................................................9

D.C. Code § 1-1163.15 ..............................................................................9

iv

Haw. Rev. Stat. § 11-393 ..........................................................................9

Mass. Gen. Laws. ch. 55 § 18G ................................................................9

Me. Stat. tit. 21A § 1013-B .......................................................................9

R.I. Gen. Laws § 17-25.3-1(b) ................................................................29

R.I. Gen. Laws § 17-25.3-1(h) ................................................................28

R.I. Gen. Laws § 17-25.3-3 ...............................................................9, 28

S.D. Codified Laws § 12-27-16.1 .............................................................9

S.F. Code § 1.110(a) ................................................................................29

S.F. Code § 1.161(a) ...............................................................2, 3, 13, 23

S.F. Code § 1.161(a)(1) ............................................................3, 5, 18, 26

S.F. Reg. 1-161.3 ......................................................................................2

Vt. Stat. tit. 17 § 2972 ..............................................................................9

Wash. Rev. Code 42.17A.350 ...................................................................9

**Other Materials:**

Electioneering Communications, 72 Fed. Reg. 72,899 (Dec. 26, 2007) ................27

Abby K. Wood, *Campaign Finance Disclosure*, 14 Ann. Rev. L. & Soc. Sci.
11 (2018) ................................................................................................8

Anna Massoglia, *'Dark money' groups find new ways to hide donors in
2020 election*, Ctr. for Responsive Politics (Oct. 30, 2020), https://www.
opensecrets.org/news/2020/10/dark-money-2020-new-ways-to-hide-
donors ....................................................................................................1

Arthur Lupia, *Shortcuts Versus Encyclopedias: Information and Voting
Behavior in California Insurance Reform Elections*, 88 Am. Pol. Sci.
Rev. 63 (1994) .......................................................................................9

Br. for Appellant, *Citizens United v. FEC*, 558 U.S. 310 (2010) (No. 08-205) ........5

Br. for Petitioner, *Americans for Prosperity Foundation v. Bonta*,
141 S. Ct. 2373 (2021) (No. 19-251) ...................................................21

Elizabeth Garrett & Daniel A. Smith, *Veiled Political Actors and Campaign
Finance Disclosure Laws in Direct Democracy*, 4 Election L.J. 295
(2015) ....................................................................................................8

Elizabeth R. Gerber & Arthur Lupia, *Campaign Competition and Policy Responsiveness in Direct Legislation Elections*, 17:3 Pol. Behav. 287 (Sept. 1995) ..................................................................................................... 8-9

Jennifer A. Heerwig & Katherine Shaw, *Through a Glass, Darkly: The Rhetoric and Reality of Campaign Finance Disclosure*, 102 Geo. L.J. 1443 (2014) ......... 8

Michael Kang, *Campaign Disclosure in Direct Democracy*, 97 Minn. L. Rev. 1700 (2013) .......................................................................................................... 8-9

## STATEMENT OF INTEREST

*Amicus curiae* Campaign Legal Center is a nonprofit, nonpartisan organization working for a more transparent, inclusive, and accountable democracy. *Amicus* submits this brief because it is concerned about the harm that could result from the arguments advanced by plaintiffs-appellants San Franciscans Supporting Prop B, *et al.*, which run counter to long-settled precedent and which, if accepted, could jeopardize a range of important electoral transparency laws.[1]

## SUMMARY OF ARGUMENT

Following *Citizens United v. Federal Election Commission* (*FEC*), 558 U.S. 310, 369 (2010), federal, state, and local elections have increasingly been awash in campaign spending from groups seeking to sway voters while hiding behind opaque names or otherwise attempting to conceal their funders.[2] The electorate's need for immediate, accessible information about the real interests financing this advertising is well-established and more acute than ever: as the Supreme Court has repeatedly recognized, such transparency enables voters to "evaluate the arguments to which

---

[1]   All parties have consented to the filing of this brief. No party or party's counsel authored any part of this brief, and no person, other than *amicus*, contributed money to fund its preparation or submission.

[2]   *See, e.g.*, Anna Massoglia, *'Dark money' groups find new ways to hide donors in 2020 election*, Ctr. for Responsive Politics (Oct. 30, 2020), https://www.opensecrets.org/news/2020/10/dark-money-2020-new-ways-to-hide-donors (noting the explosion of dark-money campaign spending over the last decade, including $750 million in 2020 alone ).

they are being subjected," *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978), and "make informed decisions and give proper weight to different speakers and messages," *Citizens United*, 558 U.S. at 371.

To this end, San Francisco has joined California and other jurisdictions, including Rhode Island, Massachusetts, and Alaska, in adopting disclaimer requirements to provide its voters with contemporaneous, "on-ad" information about the sponsor and the principal funders of the election advertising they view. *See* S.F. Code § 1.161(a); S.F. Reg. 1-161.3.

Appellant Todd David first challenged San Francisco's contributor disclaimer law in 2020, after nearly 77% of City voters approved amendments strengthening the disclaimer requirements in November 2019 as a part of Proposition F. Suppl. Excerpts of Record ("SER") 73. Although the district court upheld this law on its face, the plaintiffs persuaded the court to limit the application of the disclaimer requirement to only their ads of greater size or duration. Excerpts of Record ("ER") 7-9; *Yes on Prop B v. City & Cnty. of S.F.*, 440 F. Supp. 3d 1049, 1055 (N.D. Cal.), *appeal dismissed as moot*, 826 F. App'x 648 (9th Cir. 2020) (unpublished). Not content with this partial victory, appellants are now back for a second bite at the apple, although it is unclear what relief they are seeking in this appeal.

First, for the same reasons that this Court found *Yes on Prop B* moot on appeal, this appeal presents no live case or controversy. 826 Fed. App'x at 649. As the City

appellees note, the June 2022 primary election that was the focus of appellants' advertising has taken place, and appellants' opening brief provides no reasons for why their case is not moot, waiving these arguments. Appellees' Answering Br. ("City Br.") 10-16.

But even putting aside mootness concerns, appellants' arguments rest on claims and issues that are not properly before this Court. Below they moved for a temporary restraining order to enjoin Proposition F's secondary contributor disclaimer requirement, S.F. Code § 1.161(a)(1)—and only as applied to Plaintiffs' advertising in the June 2022 primary. ER 5, 7; SER 96, 124. *See also* City Br. 5-6. On appeal, however, appellants now ask that the entire disclaimer requirement at S.F. Code § 1.161(a) be enjoined. Appellants' Opening Br. ("AOB") 53. But appellants base this request on the size of the disclaimer and the overall contributor disclosure it requires, even though the secondary contributor disclaimer itself, the sole focus of their motion, adds little to the total volume or content of the disclaimer. There is a fatal mismatch between the laws appellants challenge, the legal arguments they make, and the relief they seek.

At base, appellants' merits case seems to reduce to the hope that the Supreme Court decision in *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2385 (2021) ("*AFPF*"), altered the legal standard for the review of electoral disclosure laws, and either supports their demand for strict scrutiny, or, in the

alternative, heightened the standard of exacting scrutiny to the extent that it "overruled the district court's approach in *Yes on Prop B*." AOB 22.

But since this supposed sea change in the law, the only courts to apply *AFPF* to disclaimer laws like San Francisco's have endorsed these measures: last year, the First Circuit affirmed the constitutionality of Rhode Island's top-five donor disclaimer for electioneering communications, *Gaspee Project v. Mederos*, 13 F.4th 79, 95 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 2647 (2022); and last month, a district court held that a challenge to Alaska's donor disclaimer law was unlikely to succeed, finding "a sufficient relationship between the government's informational interest and the on-ad top-three-donor disclaimer requirement to withstand constitutional scrutiny." *Smith v. Helzer*, No. 3:22-CV-00077-SLG, 2022 WL 2757421, at *10 (D. Alaska July 14, 2022), *appeal docketed*, No. 22-35612 (9th Cir. Aug. 2, 2022). The lower court joined this consensus when it determined that *AFPF* did not substantially "disturb the 'exacting scrutiny' formulation," ER 10, and held that the City's donor disclaimer requirements cleared this standard.

Appellants offer no grounds to depart from these holdings.

*Amicus* will focus here on two of their arguments. First, appellants strain to analogize electoral disclaimers like San Francisco's to the type of "compelled speech" that has been found to warrant strict scrutiny in unrelated strands of First Amendment jurisprudence. AOB 28-31. But the Supreme Court, as well as every

4

other court to consider this argument, has rejected the notion that strict scrutiny is warranted for electoral disclaimers requiring only factual information about an advertisement's sponsors and funders. *See, e.g.*, *Citizens United*, 558 U.S. at 368.

Nor is there any merit to appellants' claims that *AFPF* heightened the standard of exacting scrutiny or casts doubt on the district court's holding that the secondary contributor disclaimer requirement is "substantially related" to the government's important interest in an informed electorate. The Supreme Court has upheld far broader donor disclosure requirements as adequately tailored. *Citizens United*, 558 U.S. at 369; *McConnell v. FEC*, 540 U.S. 93, 196-97 (2003), *overruled in part on other grounds by Citizens United*, 558 U.S. 310. And appellants offer no evidence that City voters are confused about the secondary contributor disclosures that they overwhelmingly chose to enact into law.

Also untenable is appellants' suggestion that Section 1.161(a)(1) is not narrowly tailored because the secondary contributor disclaimer is redundant of information that is or could be made available in public disclosure reports. The same could be said of most disclaimers—including those repeatedly upheld by the Supreme Court—but the courts have nevertheless recognized that on-ad disclosure advances interests distinct from post hoc reporting. On-ad contributor disclaimers facilitate voters' instantaneous appraisal of election advertising, making them not only "a more efficient tool" for voter education than disclosure reports, but also a

means of "generating discourse" enabling informed voting—both functions that are "as vital to the survival of a democracy as air is to the survival of human life." *Gaspee Project*, 13 F.4th at 91, 95.

## ARGUMENT

## I.   Electoral Disclaimer Laws Promote First Amendment Interests.

"In a republic where the people are sovereign, the ability of the citizenry to make informed choices [in elections] is essential." *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976) (per curiam). Disclosure laws like San Francisco's directly serve the government's important informational interest in "ensur[ing] that voters have the facts they need to evaluate the various messages competing for their attention." *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010).

Appellants' fundamental mistake is to perceive San Francisco's disclaimer requirement only in terms of the burdens it imposes on speech. AOB 40-41. But the Supreme Court has made clear that disclosure also *advances* such freedoms, criticizing, for instance, the parties challenging a federal disclosure law for "ignor[ing] the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace." *McConnell*, 540 U.S. at 197 (citation omitted). Disclosure laws promote the right to self-government—one of the very core purposes of the First Amendment. "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened

6

self-government and a necessary means to protect it." *Citizens United*, 558 U.S. at 339.

The requirement challenged here offers a "reasonable and minimally restrictive method of furthering First Amendment values," *Buckley*, 424 U.S. at 82. By providing City voters with immediate information about the sponsors and funders of electioneering messages, the disclaimer "permits citizens . . . to react to [electoral] speech . . . in a proper way," *Citizens United*, 558 U.S. at 371.

On-ad disclaimers serve a particularly compelling function in the area of electoral transparency. As the district court found in *Yes on Prop B*, contributor disclaimers "provide voters with the necessary information at the time they hear (or see) the 'sound bite' and without having to independently 'explore the myriad pressures to which they are regularly subjected.'" 440 F. Supp. 3d at 1059 (citation omitted). This Court likewise has noted that disclaimers "serve[] an important governmental interest by informing the public about who is speaking in favor or against a candidate before the election." *Yamada v. Snipes*, 786 F.3d 1182, 1202 (9th Cir.), *cert. denied*, 577 U.S. 1007 (2015).

Moreover, as the First Circuit observed in *Gaspee Project*, on-ad disclaimers disclosing the sponsor's top funders are particularly "effective in generating discourse that facilitates the ability of the public to make informed choices in the specialized electoral context." 13 F.4th at 91. *See also id.* (recognizing that "[t]he

public is 'flooded with a profusion of information and political messages'" so "on-ad donor disclaimer provides an instantaneous heuristic by which to evaluate generic or uninformative speaker names") (quoting *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 57 (1st Cir. 2011)).

A growing body of empirical and scholarly research confirms these judicial findings, describing how knowing the sources of election messaging is a "particularly credible" informational cue for voters seeking to make decisions consistent with their policy preferences. Elizabeth Garrett & Daniel A. Smith, *Veiled Political Actors and Campaign Finance Disclosure Laws in Direct Democracy*, 4 Election L.J. 295, 296 (2015). As one legal scholar observed, "[r]esearch from psychology and political science finds that people are skilled at crediting and discrediting the truth of a communication when they have knowledge about the source, but particularly when they have knowledge about the source at the time of the communication as opposed to subsequent acquisition." Michael Kang, *Campaign Disclosure in Direct Democracy*, 97 Minn. L. Rev. 1700, 1718 (2013).[3]

---

[3]  *See also* Abby K. Wood, *Campaign Finance Disclosure*, 14 Ann. Rev. L. & Soc. Sci. 11, 19 (2018) ("Voters use heuristics, or informational shortcuts, to help them make the vote choice most aligned with their priorities without requiring encyclopedic knowledge . . . on every issue."); Jennifer A. Heerwig & Katherine Shaw, *Through a Glass, Darkly: The Rhetoric and Reality of Campaign Finance Disclosure*, 102 Geo. L.J. 1443, 1471-72 (2014); Elizabeth R. Gerber & Arthur Lupia, *Campaign Competition and Policy Responsiveness in Direct Legislation Elections*, 17:3 Pol. Behav. 287, 290 (Sept. 1995) (noting "how campaign statements affect a voter's beliefs depend on her assessment of the campaigner's incentive to

San Francisco is not alone in recognizing the importance of real-time disclosure of the interests funding election advertising. Jurisdictions across the country now require sponsors of political advertisements to identify their largest contributors in on-ad disclaimers, recognizing that "on-message disclosure of the source of money behind the speaker is . . . an effective means for achieving voter understanding and knowledge." *Mass. Fiscal All. v. Sullivan*, No. 18-12119-RWZ, 2018 WL 5816344 at *3 (D. Mass. Nov. 6, 2018) (citing *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 57 (1st Cir. 2011)). *See* R.I. Gen. Laws § 17-25.3-3; Alaska Stat. § 15.13.090; Cal. Gov't Code § 84503; Conn. Gen. Stat. § 9-621(h); D.C. Code § 1-1163.15; Haw. Rev. Stat. § 11-393 (amended by 2022 Haw. Laws Act 169 (H.B. 2416) (effective Jan. 1, 2023)); Me. Stat. tit. 21A, § 1013-B; Mass. Gen. Laws. ch. 55 § 18G; S.D. Codified Laws § 12-27-16.1; Vt. Stat. tit. 17, § 2972; Wash. Rev. Code 42.17A.350.

In light of this nationwide movement to provide voters with immediate, actionable information about the real interests funding the election messages they see, it is clear why disclaimer requirements like San Francisco's "have become an important part of our First Amendment tradition." *Human Life*, 624 F.3d at 1022.

---

tell the truth."); Arthur Lupia, *Shortcuts Versus Encyclopedias: Information and Voting Behavior in California Insurance Reform Elections*, 88 Am. Pol. Sci. Rev. 63, 70 (1994) (in a study of voter behavior on California tort reform measures, the largest determinant of a low-information respondent's voting behavior was "whether they knew the insurance industry's preferred electoral outcome").

**II.    San Francisco's Disclaimer Requirement is Not Subject to Strict Scrutiny.**

Like all other electoral disclosure laws and disclaimer requirements, San Francisco's secondary contributor disclaimer requirement is appropriately reviewed under exacting scrutiny. Appellants' claim that strict scrutiny is warranted because the disclaimer is analogous to compelled speech flies in the face of decisions by the Supreme Court and this Circuit holding the opposite.

**A.    No court has analyzed campaign finance disclaimers under a compelled speech rubric.**

The Supreme Court has repeatedly recognized that electoral reporting and disclaimer laws "do not prevent anyone from speaking," *Citizens United*, 558 U.S. at 366 (citation omitted), making them "the least restrictive means of curbing the evils of campaign ignorance and corruption," *Buckley*, 424 U.S. at 68. Accordingly, the Court has eschewed strict scrutiny, and instead applied "exacting scrutiny"— a still heightened and non-deferential level of review that strikes a balance between protecting speech and advancing the governmental interest in an informed electorate.

In *McConnell*, the Court applied exacting scrutiny to evaluate both the reporting and disclaimer requirements applicable to "electioneering communications" in the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81. *McConnell*, 540 U.S. at 196. BCRA required electioneering communications to include both (1) a "paid for by" statement listing

10

the name of the sponsor and its street address, telephone number, or website; and (2) a non-authorization disclaimer requiring covered communications that were not authorized by a candidate or authorized committee to state this fact. *Id.* at 230 (Rehnquist, C.J.). The Court found that these requirements were justified by "the important governmental interest of 'shed[ding] the light of publicity' on campaign financing." *Id.* at 231 (quoting *Buckley*, 424 U.S. at 81).

In *Citizens United*, the Court once again reviewed BCRA's disclosure and disclaimer provisions, now as applied, under exacting scrutiny. On an 8-1 vote, the Supreme Court rejected Citizens United's claim that it was unconstitutional to "force" it "to devote [time and space in] . . . each advertisement to [a] . . . disclaimer." 558 U.S. at 368.

This Circuit, too, has made clear that exacting scrutiny applies to all aspects of a state's disclosure and disclaimer regime. *See Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1120 (9th Cir. 2019) (collecting cases), *cert. denied*, 140 S. Ct. 2825 (2020). *See also Human Life*, 624 F.3d at 1013; *Yamada,* 786 F.3d at 1201-03.

And even when faced with compelled speech arguments like those appellants advance here, the Supreme Court and courts of appeals have declined to apply strict scrutiny to electoral disclaimer requirements. In *Citizens United*, the Supreme Court disregarded Citizens United's claim that electoral disclaimers were a form of

compelled speech triggering strict scrutiny. *See* Br. for Appellant at 43, *Citizens United*, 558 U.S. 310 (No. 08-205) (challenging BCRA's "oral and written disclaimers" as "compelled speech requirements" subject to strict scrutiny on the ground that they "compel Citizens United 'to utter statements' in its advertisements and political documentary that it 'would rather avoid'" (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995))). The Court instead applied exacting scrutiny to uphold BCRA's "paid for by" and non-authorization disclaimer requirements in full. *Citizens United*, 558 U.S. at 368.

The First Circuit recently rejected an identical "attempt to analogize" Rhode Island's top-five contributor disclaimer requirement to the compelled speech regulations that have elicited strict scrutiny, noting that the "election-related context implicated here is alone sufficient to distinguish" the compelled speech case law. *Gaspee Project*, 13 F.4th at 95. *Accord Helzer*, 2022 WL 2757421, at *10 (reviewing Alaska contributor disclaimer requirement and finding that "the burden here on independent expenditure entities is much lower" than in compelled speech case law).

The disclaimer requirement challenged here is functionally indistinguishable from the federal disclaimer requirements that the Supreme Court has repeatedly upheld under exacting scrutiny. Although identifying a group's largest primary and secondary contributors goes a step beyond identifying the sponsor's own name and address and making a non-authorization statement, the only practical distinction

12

between the federal and City disclaimer laws is the possibility that the City's requires more lines of text. But appellants' complaints about the overall size of the Section 1.161(a) disclaimer are not even properly before the Court, *see* City Br. 5-6, 38-39, and the secondary contributor disclaimer that *is* at issue requires only minimal information. Regardless, the potentially greater size or duration of San Francisco's disclaimer would only factor into the tailoring analysis, *see infra* Part III; it does not bear upon whether the disclaimer is more or less analogous to recognized examples of "compelled speech" under the First Amendment. Functionally, the City disclaimer, like its federal counterpart, simply requires factual ad sponsorship and funding information to be made immediately available to viewers, and does so for the purpose of educating voters and enabling them to "make informed decisions" at the polls. *Citizens United*, 558 U.S. at 371.

Nor do appellants articulate any legal distinction between the BCRA disclaimers and the City disclaimer. Appellants give a nod to the allegedly different "subject matter, purpose, impact on the speaker's message, and resultant length" of City disclaimers, AOB 31, but do not explain why the addition of contributor information to a disclaimer changes the constitutional calculus. *See infra* Part II.B. Finally, appellants fail to justify or even acknowledge that accepting their argument would effectively create two wholly distinct constitutional regimes for two nearly identical electoral disclaimer systems—*i.e.*, exacting scrutiny for the various federal

disclaimers and strict scrutiny for contributor disclaimers like San Francisco's—creating conflict in First Amendment jurisprudence where now there is unanimity.

> **B.** **San Francisco's disclaimer does not resemble the type of "compelled speech" that merits strict scrutiny review.**

Beyond alluding to the relative volume and "subject matter" of City disclaimers, appellants make no serious attempt to analogize City disclaimers to the forms of compelled speech that have provoked judicial concern elsewhere. Strict scrutiny has only been applied to laws compelling speech that contravenes a speaker's views or ideology, alters their substantive speech, or discriminates on the basis of viewpoint. None of these factors pertain here.

1. Electoral disclaimer requirements like San Francisco's do not "force" "dissemination of a view contrary to one's own." *Hurley*, 515 U.S. at 576.

In *Wooley v. Maynard*, 430 U.S. 705 (1977), for example, the Supreme Court invalidated a New Hampshire statute that required license plates to bear the state motto, "Live Free or Die." *Id.* at 707. The Court reasoned that this effectively compelled "appellees [to act as] a 'mobile billboard' for the State's ideological message," *id.* at 715, and to adopt a message "repugnant to their moral, religious, and political beliefs," *id.* at 707. Similarly, in *Hurley*, the Court determined that parade organizers could not be compelled to include an organization that was formed by "openly gay, lesbian, and bisexual individuals," 515 U.S. 561, because "requir[ing] private citizens who organize a parade to include among the marchers a

14

group imparting a message that the organizers do not wish to convey violates the First Amendment," *id.* at 559.

But disclaimers like San Francisco's, unlike the required speech in *Wooley* and *Hurley*, convey no ideological or political position. They are purely informative—requiring covered political committees to provide factual information about their *own* contributors that is largely already contained in their disclosure reports. Further, while the *Hurley* "parade's overall message [was] distilled from the individual presentations along the way," 515 U.S. at 577, there is no risk that disclaimers on campaign advertisements will be mistaken as the speaker's substantive message.

And appellants here are not philosophically opposed to the content of the required disclaimer. *Cf., e.g.*, *Wooley*, 430 U.S. at 707. In fact, it would be odd if appellants were to assert that their own largest contributors were somehow antithetical or "repugnant" to their beliefs. If appellants are ideologically opposed to anything here, it is not the content or scope of the disclaimer, but the requirement that they include a disclaimer at all. *Cf. Helzer*, 2022 WL 2757421, *10 (acknowledging that "Plaintiffs may hold broad ideological concerns about privacy," but holding that "the on-ad top-three-donor disclaimer does not require them to convey a message that is directly contrary to whatever political statement they seek to make"). If merely voicing ideological objection to a campaign finance law

15

resulted in application of strict scrutiny, the longstanding doctrinal framework for the review of such laws would be thrown into chaos.

2.     Nor do electoral disclaimer requirements like San Francisco's "alter speech," the second factor that has elicited compelled speech concerns.

The Supreme Court has applied strict scrutiny when a required communication alters or undermines the speaker's substantive message. In *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) *("NIFLA")*, for example, the required speech directly conflicted with the speaker's advocacy: forcing pro-life clinics to provide a disclaimer stating where women can obtain abortions "plainly 'alter[ed] the content'" of these clinics' substantive message and impeded their efforts "to dissuade women from choosing that option." *Id.* at 2371 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795 (1988)).

Likewise, in *Riley*, requiring "professional fundraisers [to] disclose to potential donors . . . the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity," 487 U.S. at 795, would "hamper the[ir] legitimate efforts . . . to raise money for the charities they represent," *id.* at 799. The required disclaimer thus impeded the very purpose of these professional fundraisers' solicitations. Compelling professional fundraisers to disclose this information "necessarily alter[ed] the content of the[ir] speech" and therefore warranted strict scrutiny review. *Id.* at 795. But the Court also noted that

16

not all disclaimers would have this effect, explaining that a disclaimer simply disclosing the fundraisers' professional status would not alter their substantive message nor undermine their fundraising efforts. *Id.* at 799 n.11.

Unlike the abortion resources disclaimer in *NIFLA* and fundraising percentage disclaimer in *Riley*, campaign finance disclaimers do not alter or impede the speaker's substantive message or purpose. On the contrary, electoral disclaimers may *further* appellants' substantive message because both election-related advertisements and electoral disclaimers seek to educate voters and inform their choices. *See supra* Part I. If anything, viewers are likely to accord greater credibility and weight to an electoral message when they know the identity of the sponsor or are aligned with the sponsor's major donors.

And even if appellants alleged that the purpose of their electoral advertisements was *not* to persuade voters but to fundraise, as in *Riley*, the City disclaimer requires only the contributor information that is already included (or could be included) in committees' disclosure reports. Appellants offer no evidence suggesting that including this information on the face of their ads will suddenly cause donations to plummet. ER 9 (plaintiffs failed to meet "evidentiary burden" to show disclaimers "actually and meaningfully deter" contributors) (internal quotation marks omitted).

3.      Lastly, electoral disclaimer requirements like San Francisco's do not discriminate based on viewpoint. Unlike a law that targets pro-life pregnancy centers because of the views they advocate, the City disclaimer law applies to all covered committees regardless of the views expressed in their campaign ads. *Cf. NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring) (expressing concern that viewpoint discrimination appeared to be "inherent in the design and structure of the law," which "requires primarily pro-life pregnancy centers to promote the State's own preferred message advertising abortions").

San Francisco's disclaimer law requires all primarily formed independent expenditure and ballot measure committees to disclose information about their largest contributors on their campaign advertising. The law is content-neutral and applies generally to all campaign advertising by such committees. S.F. Code § 1.161(a)(1).

Because electoral disclaimer requirements like San Francisco's do not discriminate on the basis of viewpoint, nor require speakers to adopt an ideologically "repugnant" message or alter their substantive speech, these disclaimers do not display any of the indicia of compelled speech that have drawn strict scrutiny. As the First Circuit held with respect to Rhode Island's comparable disclaimer law:

> [An] on-ad [contributor] disclaimer requirement . . . does not require any organization to convey a message antithetic to its own principles. The speaker can for the most part control the content of any particular communication and must disclose only some of the funding sources

18

undergirding that communication. This arrangement imposes no obligation to annunciate something inimical either to the message of the communication itself or to the fundamental beliefs of the speaker.

*Gaspee Project*, 13 F.4th at 95.

## III. The Challenged Disclosure Law Is Narrowly Tailored to San Francisco's Vital Interest in Promoting an Informed Electorate.

In the alternative, appellants argue that even if exacting scrutiny applies to the disclaimer requirement, the district court, in refusing to preliminarily enjoin the secondary contributor disclaimer, failed to apply this standard with the rigor *AFPF* demands. AOB 22. This argument fails.

### A. The statute meets the exacting scrutiny standard that has long applied to electoral disclosure laws.

Appellants do not dispute that "exacting scrutiny" requires "'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,' and that the disclosure requirement be narrowly tailored to the interest it promotes." *AFPF*, 141 S. Ct. at 2385 (2021) (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)).

But to meet exacting scrutiny, lawmakers are not obliged to adopt "the least restrictive means" or the narrowest possible disclaimer. Indeed, to survive any form of heightened First Amendment scrutiny, a law need not be "perfect, but reasonable"; the legislature need not adopt "the single best disposition[,] but one

whose scope is 'in proportion to the interest served.'" *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (plurality opinion) (citation omitted).

Appellants charge that the district court misapplied the exacting scrutiny test dictated in *AFPF*, but they do not specify their reasons for this contention. The lower court directly addressed *AFPF*'s applicability and acknowledged the narrow tailoring it prescribed, *see* ER 10-11; it ultimately concluded, however, that the *AFPF* Court had not substantially "disturb[ed] the exacting scrutiny formulation," ER 10, and that in any event, the City's informational interest here is distinct from and "far more substantial" than the interest in "administrative ease in investigating fraud" asserted in *AFPF*, ER 12.

The district court is correct: the *AFPF* majority did not purport to significantly change the exacting scrutiny standard the Supreme Court has long applied in electoral disclosure cases, such as *Buckley*, *Citizens United*, and *Reed*. On the contrary, it suggested that narrow tailoring had always been the *de facto* standard, noting in particular that *Reed* had evaluated narrow tailoring when it considered "various narrower alternatives proposed by the appellants" in reviewing the disclosure at issue there. 141 S. Ct. at 2385.

More fundamentally, *AFPF* said nothing whatsoever to question the importance of transparency to a functioning democracy. This is because *AFPF* did not concern elections at all, and thus implicated none of the weighty public interests

20

underlying electoral disclosure laws—a point the *AFPF* petitioners themselves repeatedly highlighted in their arguments to the Court. Br. for Petitioner at 28-29, *AFPF*, 141 S. Ct. 2373 (No. 19-251) (noting that the government "has a distinctive interest in ensuring our election system is free from corruption or its appearance" and that "[t]ransparency in the electoral process . . . buttress[es] trust and faith in public institutions, which is essential for our democracy").

Indeed, although narrow tailoring may represent an enhanced standard with respect to tax reporting laws, *cf. Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 548-49 (1983), it marks little change in the arena of electoral disclosure. Exacting scrutiny has always entailed an analysis of whether an electoral disclosure law is carefully tailored. *See, e.g.*, *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1249 (11th Cir. 2013) (describing tailoring inquiry as "more than a rubber stamp") (citation omitted). And although the Supreme Court may have found that the Ninth Circuit's tailoring review *in AFPF* was insufficiently rigorous, this Court has frequently applied the narrow tailoring standard in other disclosure cases. *Human Life*, 624 F.3d at 998 (upholding a Washington disclosure law because it was "narrowly tailored such that the required disclosure increases as a political committee more actively engages in campaign spending"). Indeed, as this Court noted in *Human Life*, the Ninth Circuit had in the past reviewed disclosure laws under *too stringent* a level of review—until *Reed* and *Citizens United* clarified that

exacting scrutiny, not strict scrutiny, was the correct standard. 624 F.3d at 999, 1005.[4]

Appellants identify no defect in the district court's analysis of narrow tailoring. They admit, for instance, that they do not disagree with the lower court's refusal to invalidate the City law simply because "hypothetical alternatives could also inform voters." AOB 47. The only substantive argument they make related to *AFPF* is to suggest that requiring contributor disclosure in a disclaimer merely makes "easier for voters to get that information" and thus that the governmental interest here amounts only to the type of "administrative convenience" that *AFPF* found insufficiently compelling. AOB 47. But both *McConnell* and *Citizens United* squarely held that federal disclaimers advance the government's sufficiently important interest in ensuring an informed electorate. *See supra* Part II.A. Relabeling the well-established informational interest furthered by electoral disclaimers as merely a desire for "convenience" does not countermand this precedent.

---

[4]     Appellants attempt to exploit the confusion of this era to assert that *ACLU of Nevada v. Heller*, 378 F.3d 979, 994 (9th Cir. 2004) compels strict scrutiny here, AOB 48, but the Supreme Court has since repudiated this standard, even as earlier decisions of this Circuit frequently found that disclosure laws met its high bar. *See Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 788 (9th Cir. 2006) ("assum[ing] without deciding that strict scrutiny applies" to all of the challenged disclosure requirements). *Cal. Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1174 (9th Cir. 2007) (finding that "strict scrutiny applies" and no party disputed "the existence of a compelling governmental interest").

**B.** **The disclaimer requirement is substantially related to the important interest in facilitating informed voting.**

Appellants offer a series of theories for why they believe S.F. Code § 1.161(a) fails exacting scrutiny, AOB 31-48, but none have merit.

1.    First, appellants argue that the secondary contributor disclosure provision is inadequately tailored because the informational interest justifies only the disclosure of "those who support" a ballot measure or candidate, and not the additional step of tracing the money to its original source, *i.e.*, to those who "support those who support" the measure or candidate. AOB 34. But appellants have not— and cannot—cite any support for their claim that a disclosure law cannot require political committees to trace back the financing of an election ad to secondary contributors. AOB 36-39. Publicizing information about the true sources of money spent to influence voters' choices is the central purpose of electoral transparency laws. *See supra* Part I.

Indeed, the Supreme Court has at length described the dangers posed by election messages broadcast by groups using "misleading names to conceal their identity" and the sources of their funding:

> "Citizens for Better Medicare," for instance, was not a grassroots organization of citizens, as its name might suggest, but was instead a platform for an association of drug manufacturers. And "Republicans for Clean Air," which ran ads in the 2000 Republican Presidential primary, was actually an organization consisting of just two individuals-brothers who together spent $25 million on ads supporting their favored candidate.

*McConnell*, 540 U.S. at 128 (citing *McConnell v. FEC*, 251 F. Supp. 2d 176, 232-33 (D.D.C. 2003) (per curiam)).

It is difficult to imagine a law better tailored to achieve the government's informational interest than a requirement that campaign money be traced through anonymously-named groups to the original source of the funding. Whether or not any of the appellants' secondary contributors actually intended to mislead voters, committee names are frequently uninformative and generic, *see* City Br. 32, ER 12-13 & n.4, and consequently, limiting disclosure to "primary donors" would confound the informational interests underlying the City's disclaimer law.

Without a meaningful trace-back, the disclaimer risks publicizing information that is misleading or incomplete, substantially undercutting its value to voters. So held the *Helzer* court last month in declining to enjoin an Alaska law requiring independent expenditure entities to report the "true sources" of their funds used for election advertising. *See* 2022 WL 2757421, *14 (finding "true source" provisions "substantially related and narrowly tailored to fulfill the State's informational interest in informing voters about the actual identity of those trying to influence the outcome of elections"). *See also McConnell*, 540 U.S. at 196-97 (noting that "[p]laintiffs never satisfactorily answer the question of how 'uninhibited, robust, and wide-open' speech can occur when organizations" "hid[e] behind dubious and

misleading names" from the scrutiny of the voting public (quoting *McConnell*, 251 F. Supp. 2d at 196, 237).

Instead of citing authority for their charge that trace-back disclosure is unrelated to the informational interest, appellants invoke the unfounded concern that including secondary contributors might be "confusing." AOB 37. But their concerns rest on various unproven assumptions of ignorance: that secondary donors are unaware of how their contributions are used, that the spending organization is unable or unwilling to inform their contributors of a prospective electoral use of their contributions, and that voters will be "confused" by the inclusion of secondary contributors in on-ad disclaimers. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457 (2008) (refusing to assume voter confusion in the absence of evidence). This last supposition is most untenable given that over 75% of City voters elected to enact the secondary contributor requirement through referendum. ER 13.

2.     Relatedly, appellants suggest that a disclaimer law cannot permissibly reach contributors who may only "indirectly support" election spending, AOB 37—although this proposition, if accepted, would imperil not only the secondary contributor disclaimer but all of the City's disclaimer and reporting requirements. Neither the Supreme Court nor any appellate court has suggested that the informational interest extends only to those contributors who explicitly "earmark"

their contributions to support election-related advocacy, as appellants claim, AOB 35.[5] Indeed, the weight of the case law indicates the opposite.

The Supreme Court has repeatedly upheld the federal electioneering communication disclosure law, 52 U.S.C. § 30104(f), although it was not so limited. *Citizens United*, 558 U.S. at 369; *McConnell*, 540 U.S. at 196-97. This federal law requires a covered group making "electioneering communications" to disclose *all* contributors over a threshold amount—unless it establishes a separate segregated bank account containing "funds contributed solely by individuals . . . directly to this account." 52 U.S.C. § 30104(f)(2)(E). The federal statute thus requires far *more* donor disclosure than San Francisco's disclaimer law, which requires disclosure of only the covered committee's *three* largest contributors (and, if a top contributor is a committee, that committee's two largest contributors). S.F. Code § 1.161(a)(1).

Appellants highlight that the FEC, by regulation, subsequently provided that only contributions earmarked for electioneering communications need be disclosed, AOB 37-38—but this regulation was adopted years after *McConnell* upheld the

---

[5]     Appellants cite *Independence Institute v. Williams*, 812 F.3d 787, 797 (10th Cir. 2016) and *Independence Institute v. FEC*, 216 F. Supp. 3d 176, 191 (D.D.C. 2016), in support of this proposition, but neither reviewed a disclosure statute that limited donor disclosure to earmarked contributions. The relevant administrative agencies in both cases had added "earmarking" regulations narrowing the statutes, but the courts did not condition their decisions to sustain either law on the existence of an such a rule.

statute against facial challenge. *See* Electioneering Communications, 72 Fed. Reg. 72,899 (Dec. 26, 2007) (final rule); *McConnell*, 540 U.S. at 194-202. Although the regulation had been adopted by the time of the *Citizens United* decision, it had already been challenged in court, and neither the parties nor the Supreme Court relied on it. The D.C. Circuit has accordingly rejected the contention that "the Supreme Court's holding was limited by" the earmarking regulation. *Van Hollen v. FEC*, No. 12-5117, 2012 WL 1758569, at *3 (D.C. Cir. May 14, 2012) (unpublished).[6]

Other courts of appeals, including this one, have understood *McConnell* and *Citizens United* as confirming the constitutionality of statutes requiring organizations active in elections to disclose their contributors over a monetary threshold, regardless of whether the contributions were designated for campaign purposes. *See, e.g.*, *Yamada*, 786 F.3d at 1194-1201; *Family PAC v. McKenna*, 685 F.3d 800, 803, 807-11(9th Cir. 2012).[7]  Indeed, the Fourth Circuit reversed a district

---

[6]  Although the D.C. Circuit upheld the FEC's earmarking rule in *Van Hollen v. FEC*, 811 F.3d 486 (D.C. Cir. 2016), that was an Administrative Procedure Act challenge, not a First Amendment one. Under deferential review, the court found that the FEC rule was a permissible construction of the statutory disclosure provision, *id*. at 493. But it did not suggest that the First Amendment requires this type of earmarking limitation, and in fact expressly "forestall[ed]" any constitutional questions "to some other time." *Id*. at 501.

[7]  Instead, many circuits have upheld laws requiring near plenary donor disclosure. *See, e.g.*, *Del. Strong Families v. Att'y Gen. of Del*., 793 F.3d 304, 312 n.10 (3d Cir. 2015) (groups spending $500 or more on electioneering ads must disclose all contributors above $100 for the preceding four years); *Justice v. Hosemann*, 771

court precisely *because* it had imposed an earmarking limitation to remedy the alleged unconstitutionality of a disclosure requirement. *Ctr. for Individual Freedom v. Tennant*, 706 F.3d 270, 292 (4th Cir. 2013).

Nor have appellants explained why this analysis should shift for a disclaimer law. The First Circuit upheld both Rhode Island's reporting law and its top-five contributor disclaimer requirement, neither of which was limited to "earmarked" contributors. *Gaspee Project*, 13 F.4th at 95; *see also* R.I. Gen. Laws § 17-25.3-1(b), (h). The disclaimer provision simply provided that covered organizations "list their five largest donors [above $1,000] from the previous year" "on the electioneering communication itself." 13 F.4th at 83 (citing R.I. Gen. Laws § 17-25.3-3). And the First Circuit concluded that "the disclaimer requirement . . . applies to a small number of contributors, based on a reasonable assessment of their likely roles in financing the particular electioneering communication." *Id.* at 93.

3.     Lastly, appellants charge that the secondary contributor disclaimer is superfluous because "[i]nquisitive San Francisco voters need only visit the Ethics Commission's offices near City Hall" where similar information is available or could be made available in "[c]ampaign statements . . . open for public inspection

---

F.3d 285, 289 (5th Cir. 2014) (committees must itemize and report all contributions of $200 or more); *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 124 (2d Cir. 2014) (committees must file reports "identifying each person who contributed more than $100"); *Worley*, 717 F.3d at 1251 (groups must disclose all donors starting from a "first-dollar disclosure threshold").

and reproduction." AOB 46 (citing S.F. Code § 1.110(a)). But the informational benefits of disclaimers and disclosure reports are not coextensive. As the district court found, "fewer people are likely to see" disclosure reports, and "disclosure in person at the Ethics Commission or online would not provide the information contemporaneously with the speech." ER 12 (quoting *Majors v. Abell*, 361 F.3d 349, 353 (7th Cir. 2004)).

Similarly, the First Circuit also explained that on-ad disclaimers are not "redundant to the donor information revealed by public disclosures" because disclaimers are "a more efficient tool for a member of the public who wishes to know the identity of the donors backing the speaker." *Gaspee Project*, 13 F.4th at 91. These findings are borne out in the social science research summarized in Part I, which documents how public disclosure of the sources behind election spending, particularly through contemporaneous on-ad disclaimers, equips voters with valuable informational shortcuts that facilitate knowledgeable choices on Election Day.

More fundamentally, the logic of appellants' redundancy argument would apply equally to many disclaimers, including those upheld by the Supreme Court. *See* ER 8 (noting that "*Citizens United* had approved of a disclaimer that was at least partially redundant of reporting requirements"). But the Supreme Court has never suggested that electoral disclaimers cannot pass muster because the information they

disseminate is also later made public in disclosure reports filed with election authorities. Instead, the Court upheld *both* the federal disclaimer and reporting regimes simultaneously, recognizing the related, but distinct, purposes they serve.

## CONCLUSION

The district court's decision should be AFFIRMED.

**Dated: August 5, 2022**

Respectfully submitted,

/s/ Tara Malloy
Tara Malloy
Megan P. McAllen
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, D.C. 20005
Telephone: (202) 736-2200
Facsimile: (202) 736-2222
tmalloy@campaignlegalcenter.org
mmcallen@campaignlegalcenter.org

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32 because this brief contains 6,897 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: August 5, 2022

/s/ Tara Malloy
Tara Malloy

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s):**   No. 22-15824

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**  s/ Tara Malloy      **Date**   Aug. 5, 2022
*(use "*s/[typed name]*" to sign electronically-filed documents)*

32

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2022, I electronically filed a copy of the foregoing Brief *Amicus Curiae* using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 5, 2022

/s/ Tara Malloy
Tara Malloy