No. 22-15824

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

N<small>O ON</small> E, et al.,

Appellants,

v.

DAVID CHIU, et al.,

Appellees.

On Appeal from the United States District Court
for the Northern District of California
No. 3:22-cv-02785-CRB
Hon. Charles R. Breyer

BRIEF OF THE LIBERTY JUSTICE CENTER AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS' PETITION FOR REHEARING EN BANC

Daniel R. Suhr
  *Counsel of Record*
Reilly Stephens
L<small>IBERTY</small> J<small>USTICE</small> C<small>ENTER</small>
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
(312) 637-2280
dsuhr@libertyjusticecenter.org

March 29, 2023

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(a), Liberty Justice Center states that it is a nonprofit corporation registered in the State of Illinois, and has no parent company and no stockholders.

# TABLE OF CONTENTS

INTEREST OF THE AMICUS CURIAE ................................................. 1

INTRODUCTION ................................................................................ 2

ARGUMENT ...................................................................................... 3

I.  THIS CASE MERITS EN BANC REVIEW BECAUSE MULTIPLE STATES IN THIS CIRCUIT HAVE RECENTLY PASSED SIMILAR LAWS AND SAN FRANCISCO'S REGULATIONS THEREFORE REPRESENT AN IMPORTANT QUESTION OF LAW WITH IMPLICATIONS WELL BEYOND THIS CASE. ............................................. 3

II. THIS COURT SHOULD REVERSE THE PANEL DECISION EN BANC BECAUSE IT IS INCONSISTENT WITH THE PRECEDENTS OF THIS COURT AND THE SUPREME COURT............................................................................................. 7

CONCLUSION ................................................................................. 13

CERTIFICATE AS TO LENGTH ......................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Nev. v. Heller*, 378 F.3d 979 (9th Cir. 2004) .............................. 8
*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) ................... 9
*California v. Byers*, 402 U.S. 424 (1971) .................................................... 8
*Edwards v. South Carolina*, 372 U.S. 229 (1963) .................................... 12
*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................. 12
*Hughes Salaried Retirees Action Comm. v. Adm'r of the Hughes Non-Bargaining Ret. Plan*, 72 F.3d 686 (9th Cir. 1995) ............................... 8
*Janus v. AFSCME*, 138 S. Ct. 2448 (2018) .............................................. 12
*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ....................... 8
*United States v. Valdes-Vega*, 738 F.3d 1074 (9th Cir. 2013) .................. 8
*West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943) ..................... 12

**Statutes**

Alaska Stat. § 15.13.400(19) ....................................................................... 4
Ariz. Rev. Stat. § 16-972 .............................................................................. 6
Ariz. Rev. Stat. § 16-972 .............................................................................. 6

**Other Authorities**

Robert McKay, *Self-Incrimination and the New Privacy*, 1967 Sup. Ct. Rev. 193 ................................................................................................. 8

INTEREST OF THE AMICUS CURIAE[1]

The Liberty Justice Center is a nonprofit, nonpartisan, public-interest litigation firm that seeks to protect economic liberty, private property rights, free speech, and other fundamental rights. The Liberty Justice Center pursues its goals through strategic, precedent-setting litigation to protect core First Amendment rights.

As part of its mission to defend fundamental rights, the Center works to protect the privacy of citizens participating in civil society, including defending the right of donors to privacy in their political associations. *See, e.g., Smith v. Helzer*¸ 9th Cir. No. 22-35612; *Chancey v. Ill. State Bd. of Elections*, No. 22 CV 04043, 2022 U.S. Dist. LEXIS 188097 (N.D. Ill. Oct. 14, 2022).

Liberty Justice Center secured consent from counsel for both Plaintiffs and Defendants to file this brief. *See* Fed. R. App. P. 29(a)(2).

---

[1] Fed. R. App. P. 29(a)(4)(E) statement: No counsel for any party authored any part of this brief, and no person or entity other than *Amicus* funded its preparation or submission.

1

## INTRODUCTION

The Liberty Justice Center submits this *amicus* brief in support of the Appellants' petition for en banc review to emphasize that the issues raised by Appellants merit this Court's en banc consideration. In just the past few years, both Alaska and Arizona have adopted donor disclosure requirements much like the San Francisco rules challenged here, meaning this Court will inevitably be obliged to confront the question sooner or later, and the best approach is to grant review in this case and resolve the matter for both this Circuit and for the regulated parties throughout it.

This Court should therefore grant en banc review, and reverse the decision below, because the panel decision is inconsistent with the precedent of both this Court and the Supreme Court. San Francisco's requirement that political speakers disclose not just their donors, but also the entire genealogy of donations they've received, fails both the strict scrutiny to which it is rightfully subject and the lesser scrutiny the panel chose to apply.

# ARGUMENT

**I. This case merits en banc review because multiple states in this Circuit have recently passed similar laws and San Francisco's regulations therefore represent an important question of law with implications well beyond this case.**

The challenged San Francisco policy is new, but no longer unusual. In the past few years, just in this circuit, two states have enacted similar laws requiring the expanded disclosure of tangential donors to the donors of donors. In Alaska, 2022's Ballot Measure 2 requires that any ad disclaimer include not simply the name of the person who paid for the ad, but also the "true source" of the money, examining not simply donors' finances, but the donors of those donors, and their donors in turn—to infinity. In 2022, Arizona followed up with its own Proposition 211, which similarly requires any speaker who buys a sufficient number of ads to disclose their "original" donor, however far afield that might take one. *Amicus* Liberty Justice Center already has a case pending before this court challenging the Alaska law,[2] and at least one lawsuit against the 2022 enactment is already pending in Arizona state court.[3]

---

[2] *Smith v. Helzer*, 9th Cir. No. 22-35612.
[3] *Center For Arizona Policy v. Hobbs*, *available at* https://www.goldwaterinstitute.org/wp-content/uploads/2022/12/Verified-Complaint.pdf.

3

This important First Amendment issue is relevant to multiple jurisdictions in this circuit and is therefore a strong candidate for en banc review.

Among other provisions, Alaska's Ballot Measure 2 compels not only the disclosure of an entity's donors, but also any donors to the entity's donors, and in turn any donors to the entity's donors' donors, requiring secondary and tertiary disclosure of third parties who have not themselves chosen to speak or advocate in Alaska elections. The law requires that every donor disclose the "true source" of a donation, which the law defines as tracing every dollar back all the way to the human being or corporation who earned the money. Alaska Stat. § 15.13.400(19). For example: Under prior law, if the Alaska State Chamber of Commerce ran an independent expenditure ad, it would have to disclose its donors, such as a local chamber like the Anchorage Chamber of Commerce. Under Ballot Measure 2, the state chamber must still report all of its donors. And the Anchorage Chamber separately must report itself as the donor and report its members. And if the donors to the Anchorage Chamber included, say, a non-profit entity like the Humane Society or

4

Boys & Girls Club or a church or synagogue, then the Anchorage Chamber would also have to report donors to that non-profit entity. And if the Humane Society received a donation from the Anchorage Dog Lovers Club—well, you get the idea. And under Ballot Measure 2 all of this information must be lined up before the Anchorage Chamber's donation is made, because all of the information must be reported within *24 hours*, subject to fines of $1,000 *per day* for getting it wrong.

The State does not keep these sweeping and unprecedented disclosures in confidence, as it might if it were only using the information to further its interest in enforcing its laws. Rather, Alaska posts donor reports online, so anyone can see a donor's name, home address, and occupation. Under Ballot Measure 2, anyone who gives money to an organization that then donates money to some other entity that then makes independent expenditures can find their name posted on a government website as a supporter of a cause or candidate—exposing them to harassment or retaliation based on their ostensible support of a candidate they might never have even heard of. As a result, some organizations will decline to participate in political speech at all rather than see their members (and their members' donors, and so on) disclosed.

5

Arizona's Proposition 211, Ariz. Rev. Stat. § 16-972, likewise requires organizations that speak during elections to disclose of the source of "original monies." In some ways it may improve on the Alaska model: § 16-972(B) requires that an independent expenditure group provide notice to its donors that their money might be spent for political purposes, and allows the donors to opt out—otherwise the money must be bifurcated.

Each of these states define the "original" money from the "true source" as essentially the personal or business income of some originating person, and like San Francisco require that their identities be not simply revealed to the government for audit purposes, but be publicized, regardless of whether the individual gave the organization money for this purpose at all. In this regard Arizona may improve on the Alaska example in providing those unwitting donors an opt-out, but in return it imposes more onerous recordkeeping requirements, requiring even innocent small donors to keep records of their transactions for five years. *See* Ariz. Rev. Stat. § 16-972.

The disclosure schemes enacted in San Francisco, Alaska, and Arizona all impose the same basic requirement, but each has its idiosyncrasies, and it's possible that this Court might even come to different conclusions on each—perhaps Arizona's opt-out requirement cures First Amendment problems with Alaska, or perhaps the 5-year record requirement on individual donors is even worse than alternatives. But this Court can and should provide definitive guidance on the matter, so that both these and future jurisdictions can understand the First Amendment limits (or lack thereof) on these kinds of restrictions.

## II. This Court should reverse the panel decision en banc because it is inconsistent with the precedents of this Court and the Supreme Court.

Requiring speakers to track their donors' money all the way back to some supposed origin point violates the freedom of private association by compelling independent expenditure groups to keep track and disclose not simply their own donors, but also donors to those donors, and donors to those donors' donors, reaching out infinitely. These requirements violate free association by requiring disclosure of donations that were not made in any particular way related to electoral spending.

A desire for anonymity when engaging on issues, whether as a speaker or a donor, may be motivated "by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). A business or association as well as an individual might wish to maintain that privacy. *ACLU of Nev. v. Heller*, 378 F.3d 979, 990 (9th Cir. 2004). "[D]epriving individuals of this anonymity is a broad intrusion" into their private affairs. *Id.* at 988.

Privacy is no less important for being ephemeral. It "has always been a fundamental tenet of the American value structure." *California v. Byers*, 402 U.S. 424, 450 (1971) (Harlan, J., concurring) (quoting Robert McKay, *Self-Incrimination and the New Privacy*, 1967 Sup. Ct. Rev. 193, 210). Privacy is an end in itself that courts must respect and protect. *United States v. Connolly*, 321 F.3d 174, 188 (1st Cir. 2003). Privacy interests are especially pronounced when private financial information is involved. *See Hughes Salaried Retirees Action Comm. v. Adm'r of the Hughes Non-Bargaining Ret. Plan*, 72 F.3d 686, 695 n.8 (9th Cir. 1995). "[O]ur nation values individual autonomy and privacy," *United States v. Valdes-Vega*, 738 F.3d 1074, 1076 (9th Cir. 2013), and the loss of that privacy is in itself a substantial burden.

Requiring expansive genealogies of the sources of donations invades this protected privacy interest. And these rules are not limited to large or influential contributors. Alaska's version requires any group that receives as little as $2,000 to disclose what the law calls the "true source" of the funds. Under this framework, the "true source" of the money is "a person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services," as opposed to someone who "derived funds via contributions, donations, dues, or gifts," which Alaska terms an "intermediary."

The First Amendment restricts burdensome disclosure requirements because "each governmental demand for disclosure brings with it an additional risk of chill." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021) ("*AFPF*"). "True source" requirements burden speech in several ways. For one, they demand of recipients that they disclose information they might not even have access to. Entities are not generally in the business of tracking the finances of other entities—indeed, donor lists for nonprofit entities are valuable and closely held pieces of information that implicate both associational privacy and also the abil-

ity for groups to compete in the marketplace for donations—the equivalent of demanding that companies publicize their sales leads. Second, compelled secondary disclosure chills speech by limiting who an independent expenditure group can solicit funds from. These "true source" requirements are a departure from accepted practice around the country, and many potential donors will refuse to participate in elections rather than severely alter their usual operations, which are conducted on the basis of donor privacy. Third, these requirements sweep up innocent third parties who are nowhere near any nexus to the given elections—an arbitrary citizen who gave funding to a group they were familiar with, only to discover later that their privacy has been invaded not because of who they gave it to, but because of the political speech of another group they've never heard of and never donated to, whose speech they might even disagree with, all because some portion of the money they gave to a different entity for a different cause ended up weaving its way to a group engaged in political speech in Alaska or San Francisco.

Indeed, "true source" requirements are not only burdensome, they are misleading, in that they associate donors with causes they may have no interest in at all—even causes they oppose. People give money

10

to a particular entity for a particular purpose, among many purposes that entity may have. Jane Doe may donate to a libertarian-minded nonprofit because she supports that group's libertarian position against foreign military interventions. She will be very surprised to find her name among the funders of ads opposing an increase in San Francisco's tax rates, a policy position she has never considered and happens to disagree with. But it turns out the group she donated to also provides funding to independent expenditure groups that advocate for lower taxes.

In this sense, a "true source" requirement doesn't simply punish association, it also compels association, affiliating donors with whichever cause or speaker somehow comes into possession of the funds, regardless of the original donor's intent or beliefs. This compulsory association likewise violates the First Amendment because "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning. . . . [A] law commanding involuntary affirmation of objected-to beliefs would require even more immediate and urgent grounds than a law demanding silence." *Janus v. AFSCME*, 138 S. Ct.

11

2448, 2464 (2018) (quoting *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 633 (1943) (internal quotation marks omitted)).

Moreover, there's an inherent vagueness in the ways these laws attempt to distinguish between donations and income. Restrictions on speech require "a precise statute 'evincing a legislative judgment that certain specific conduct be . . . proscribed'" *Grayned v. City of Rockford*, 408 U.S. 104, 124 n.5 (1972) (quoting *Edwards v. South Carolina*, 372 U.S. 229, 236 (1963)). Avoiding vague and manipulable language is necessary to "assure[] [courts] that the legislature has focused on the First Amendment interests and determined that other governmental policies compel regulation." *Id*. But these laws display no such precision, instead establishing a false dichotomy between income and donations. In the nonprofit sector, donations are revenue, and the attempt to bifurcate the two concepts collapses into confusion. Do these laws' inclusion of inherited money include inheriting a corporation that has existing cash on hand that a donor decides to direct to a favored cause? Is the heir in that case a true source, or does one need to trace the corporate treasury's funds back to an even 'truer' source?

## CONCLUSION

For the foregoing reasons, this Court should grant en banc review and reverse the panel decision.

Respectfully submitted,

                                    Daniel R. Suhr
                                    *Counsel of Record*
                                    Reilly Stephens
                                    LIBERTY JUSTICE CENTER
                                    440 N. Wells Street,
                                    Suite 200
                                    Chicago, Illinois 60654
                                    (312) 637-2280
                                    dsuhr@libertyjusticecenter.org

                                    March 29, 2023

## CERTIFICATE AS TO LENGTH

Pursuant to Fed. R. App. P. 32, counsel of record certifies that the body of this brief, including footnotes, contains 2,283 words.