**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NO ON E, SAN FRANCISCANS OPPOSING THE AFFORDABLE HOUSING PRODUCTION ACT; EDWIN M LEE ASIAN PACIFIC DEMOCRATIC CLUB PAC SPONSORED BY NEIGHBORS FOR A BETTER SAN FRANCISCO ADVOCACY; TODD DAVID, | No. 22-15824 |
| | D.C. No. 3:22-cv-02785-CRB |
| *Plaintiffs-Appellants*, | |
| v. | ORDER AND AMENDED OPINION |
| DAVID CHIU, in his official capacity as San Francisco City Attorney; SAN FRANCISCO ETHICS COMMISSION; BROOKE JENKINS, in his official capacity as San Francisco District Attorney; CITY AND COUNTY OF SAN FRANCISCO, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted December 9, 2022
San Francisco, California

Filed March 8, 2023
Amended October 26, 2023

Before:  Susan P. Graber and Ronald M. Gould, Circuit
Judges.[*]

Order;
Opinion by Judge Graber;
Dissent from Order by Judge Collins;
Dissent from Order by Judge VanDyke

**SUMMARY**[**]

**First Amendment/Political Advertising**

The panel issued (1) an order amending its opinion filed
on March 8, 2023, denying a petition for rehearing en banc,
and ordering that no future petitions will be entertained; and
(2) an amended opinion affirming the district court's denial
of Plaintiffs' motion for a preliminary injunction seeking to
enjoin enforcement of a San Francisco ordinance that
imposes a secondary-contributor disclaimer requirement on

---

[*] Judge Watford, who was on the panel that issued the original opinion,
left the court on May 31, 2023. In accordance with General Order 3.2(h),
this Order and the Amended Opinion are issued by the remaining panel
members as a quorum pursuant to 28 U.S.C. § 46(d).

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

certain political advertisements, in addition to California's top contributor disclaimer requirement.

Under California law, certain political advertisements run by a committee must name the committee's top financial contributors. The City and County of San Francisco added a secondary-contributor disclaimer requirement that compels certain committees, in their political advertisements, also to list the major donors to those top contributors. Plaintiffs, who supported the passage of a ballot measure in the June 7, 2022, election, alleged that the secondary-contributor disclaimer requirement violates the First Amendment, both on its face and as applied against Plaintiffs.

The panel first determined that even though the June 2022 election had occurred, this appeal was not moot because the controversy was capable of repetition yet evading review.

The panel held that Plaintiffs had not shown a likelihood of success on the merits of their First Amendment claim. Applying exacting scrutiny, the panel held that because the interest in learning the source of funding for a political advertisement extends past the entity that is directly responsible, the challenged ordinance was substantially related to the governmental interest in informing voters of the source of funding for election-related communications. Given the strength of the governmental interest, the panel was not persuaded by Plaintiffs' argument that the size and duration of the required disclaimers displaced an excessive amount of Plaintiffs' speech and presented an impermissible burden on their First Amendment rights. The requirements were closely tailored to Defendants' interest of informing the public about the

source of funding and were not greater than necessary to accomplish that goal. Plaintiffs' argument that the secondary-contributor requirement violated their right to freedom of association was likewise insufficient to outweigh the strength of the governmental interests.

Addressing the remaining preliminary injunction factors, the panel concluded that the public interest and the balance of hardships weighed in favor of Defendants.

Dissenting from the denial of rehearing en banc, Judge Collins, joined by Judges Callahan, Ikuta, Bennett, R. Nelson, Lee, Bress, Bumatay and VanDyke, wrote that the panel's decision warranted rehearing en banc because the ordinance permitted San Francisco to commandeer political advertising to an intrusive degree and greatly exceeded what settled caselaw would tolerate even in the context of commercial speech, let alone political speech, which is entitled to a higher degree of constitutional protection. Judge Collins believes the ordinance is unduly burdensome and violates the First Amendment.

Dissenting from the denial of rehearing en banc, Judge VanDyke, joined by Judges Callahan, Ikuta, Bennett, R Nelson, Collins, Lee, Bress, and Bumatay wrote that the ordinance seriously burdened Plaintiffs' association and speech rights and will inevitably result in voter confusion. In compelling the on-ad disclosures, the ordinance will cause the public to naturally infer second-degree associations between political speakers and secondary contributors, notwithstanding the absence of any logical basis to infer such an association actually exists.

## COUNSEL

Alan Gura (argued), Institute for Free Speech, Washington, D.C.; James R. Sutton, The Sutton Law Firm, San Francisco, California; for Plaintiff-Appellant.

Tara M. Steeley and Wayne K. Snodgrass, Deputy City Attorneys; David Chiu, City Attorney; San Francisco City Attorney's Office, City and County of San Francisco, San Francisco, California; for Defendant-Appellee.

Tara Malloy and Megan P. McAllen, Campaign Legal Center, Washington, D.C., for Amicus Curiae American Legal Center.

Daniel R. Suhr and Reilly Stephens, Liberty Justice Center, Chicago, Illinois, for Amicus Curiae Liberty Justice Center.

---

## ORDER

The Opinion filed on March 8, 2023, is hereby amended. The amended opinion will be filed concurrently with this order.

Appellants filed a petition for rehearing en banc, Docket No. 41. Judge Graber recommends denial of the petition for rehearing en banc and Judge Gould so votes.

The full court was advised of the petition for rehearing en banc. A judge of the court requested a vote on en banc rehearing. The matter failed to receive a majority of votes of non-recused active judges in favor of en banc consideration. See Fed. R. App. P. 35. The petition for rehearing en banc is DENIED. No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

GRABER, Circuit Judge:

In response to the growing prevalence of money in politics, many governments have required groups that run political advertisements to identify their funding sources publicly. Under California law, certain political advertisements run by a committee must name the committee's top contributors. The City and County of San Francisco adds a secondary-contributor disclaimer requirement that compels certain committees, in their political advertisements, also to list the major donors to those top contributors. [1]

Plaintiffs—a political committee that runs ads, the committee's treasurer, and a contributor to the committee— seek to enjoin enforcement of San Francisco's ordinance. They allege that the secondary-contributor requirement violates the First Amendment. The district court held that Plaintiffs are unlikely to succeed on the merits and denied Plaintiffs' request for a preliminary injunction. Reviewing the denial of a preliminary injunction for abuse of discretion and the underlying legal principles de novo, Fyock v. Sunnyvale, 779 F.3d 991, 995 (9th Cir. 2015), we agree with the district court. Plaintiffs have not shown a likelihood of

---

[1] The parties in this case distinguish between "disclaimers" (statements at the time of the advertisement, identifying who is funding the ad) and "disclosures" (public reports filed with government entities). Although that distinction is recognized in the case law, see, e.g., Citizens United v. FEC, 558 U.S. 310, 366–67 (2010), some courts use the terms interchangeably. Where relevant, we clarify whether laws considered by prior courts required disclosures or disclaimers, consistent with the foregoing definitions.

success on the merits. San Francisco's requirement is substantially related to the governmental interest in informing voters of the source of funding for election-related communications. The ordinance does not create an excessive burden on Plaintiffs' First Amendment rights relative to that interest, and it is sufficiently tailored to the governmental interest. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. California Political Reform Act

The California Political Reform Act defines a "committee" as "any person or combination of persons" who, in a calendar year, receives contributions totaling $2,000 or more; makes independent expenditures totaling $1,000 or more; or makes contributions totaling $10,000 or more to, or at the behest of, candidates or committees. Cal. Gov't Code § 82013. A "primarily formed committee" is defined as a committee that receives $2,000 or more in contributions in a calendar year and is formed or exists primarily to support or oppose a single candidate, a single measure, a group of candidates being voted on in the same election, or two or more measures being voted on in the same election. Id. § 82047.5. Every committee, whether or not it is primarily formed, must file a statement of organization with the California Secretary of State and the relevant local filing officer, id. § 84101(a), which in this case is the San Francisco Ethics Commission. See S.F. Campaign & Governmental Conduct Code ("S.F. Code") § 1.112(a)(1).

Committees must file semiannual statements, Cal. Gov't Code § 84200(a), and must file two preelection statements, one at least 40 days before an election and the second at least 12 days before an election, id. §§ 84200.5, 84200.8. Among other requirements, each of those campaign statements must

include "[t]he total amount of contributions received during the period covered by the campaign statement and the total cumulative amount of contributions received." Id. § 84211(a). If any donor contributes money to the committee during a reporting period and has given aggregate contributions of $100 or more, then the report must include that donor's name, address, occupation, and employer, plus the dates and amounts of the donor's contributions during the period and the donor's total aggregate contributions. Id. § 84211(f).

California law also requires specific disclaimers in political advertisements. Id. §§ 84501–84511. An "advertisement" is defined as "any general or public communication that is authorized and paid for by a committee for the purpose of supporting or opposing a candidate or candidates for elective office or a ballot measure or ballot measures." Id. § 84501(a)(1). Advertisements must include the words "[a]d paid for by [the name of the committee]." Id. § 84502(a)(1). They also must state "committee major funding from," followed by the names of the top contributors to the committee. Id. § 84503(a). "Top contributors" are defined as "the persons from whom the committee paying for an advertisement has received its three highest cumulative contributions of fifty thousand dollars ($50,000) or more." Id. § 84501(c)(1). Depending on the medium, the advertisement must follow certain formatting requirements. See id. §§ 84504.1 (video); 84504.2 (print); 84504.4 (radio and telephone); 84504.3 (electronic media); 84504.6 (online platforms).

B. San Francisco's Proposition F

On November 5, 2019, San Francisco voters passed Proposition F. Referred to by proponents as the "Sunlight

on Dark Money Initiative," Proposition F changed the disclaimer requirements for advertisements paid for by independent political committees, among other provisions. After the passage of Proposition F, "all committees making expenditures which support or oppose any candidate for City elective office or any City measure" must comply with the City's new disclaimer requirements, in addition to the state's requirements. S.F. Code § 1.161(a).

Under the new ordinance, ads run by primarily formed independent expenditure and ballot measure committees must include a disclaimer listing their top three contributors of $5,000 or more. Id. § 1.161(a)(1). Additionally, "[i]f any of the top three major contributors is a committee, the disclaimer must also disclose both the name of and the dollar amount contributed by each of the top two major contributors of $5,000 or more to that committee." Id. The ad also must inform voters that "[f]inancial disclosures are available at sfethics.org" or, if an audio ad, provide a substantially similar statement that specifies the website. S.F. Code § 1.161(a)(2).

Printed disclaimers that identify a "major contributor or secondary major contributor" must list the dollar amount of relevant contributions made by each named contributor. S.F. Code § 1.161(a)(1); S.F. Ethics Comm'n Reg. ("S.F. Reg.") 1.161-3(a)(4). Print ads must include the disclaimers in text that is "at least 14-point, bold font." S.F. Code § 1.161(a)(3). Audio and video advertisements must begin by speaking the required disclaimers of major contributors and secondary major contributors, but need not disclose the dollar amounts of those donors' contributions. Id. §§ 1.161(a)(5); 1.162(a)(3). In addition, video ads must display a text banner that contains similar information to that

required in print ads. Cal. Gov't Code § 84504.1; S.F. Code § 1.161(a)(1).**²**

Violations of the City's campaign finance laws are punishable by civil, criminal, and administrative penalties. S.F. Code § 1.170. A committee's treasurer may be held personally liable for violations by the committee. Id. § 1.170(g). Any individual who suspects a possible violation may file a complaint with the Ethics Commission, City Attorney, or District Attorney. Id. § 1.168(a); see id. § 1.168(b) (providing for enforcement through civil action); San Francisco Charter, appendix C, § C3.699-13 (Ethics Commission procedures for investigations and enforcement proceedings).

C.  Earlier Litigation Challenging Proposition F

In 2020, Todd David founded Yes on Prop B, Committee in Support of the Earthquake Safety and Emergency Response Bond.**³** David and Yes on Prop B challenged San Francisco's secondary-contributor requirement in the lead-up to the March 3, 2020 election. On February 20, 2020, the district court enjoined the application of that requirement to the plaintiffs' smaller and shorter advertisements "because they [left] effectively no room for pro-earthquake safety

---

² The City recently amended the statute to provide for two exemptions from the ordinance's secondary-contributor requirements. First, the requirement to disclose secondary major contributors does not apply to print advertisements that are 25 square inches or smaller. S.F. Code § 1.161(a)(1)(A). Second, the requirement to disclose secondary major contributors does not apply to the spoken disclaimer in an audio or video advertisement that is 30 seconds or less. Id. § 1.161(a)(1)(B).

³ The Prop B at issue in the 2020 litigation concerned an earthquake safety and emergency response bond and is unrelated to the Prop B that was originally at issue in this litigation.

messaging." <u>Yes on Prop B v. City & County of San Francisco</u>, 440 F. Supp. 3d 1049, 1051, 1062 (N.D. Cal. 2020). The district court, however, concluded that the challenged ordinance was "not an unconstitutional burden on larger or longer advertising" and declined to enjoin the secondary-contributor disclaimer requirement on its face or as applied to the plaintiffs' larger ads. <u>Id.</u> at 1051, 1061–62.

On October 21, 2020, in an unpublished disposition, we dismissed the plaintiffs' appeal on the ground of mootness. <u>Yes on Prop B v. City & County of San Francisco</u>, 826 F. App'x 648 (9th Cir. 2020). The plaintiffs argued that the "capable of repetition, yet evading review exception" applied, but we held that the case was moot because the plaintiffs had not "shown that 'there is a reasonable expectation that the same complaining party will be subject to the same action again.'" <u>Id.</u> at 649 (quoting <u>Protectmarriage.com–Yes on 8 v. Bowen</u>, 752 F.3d 827, 836 (9th Cir. 2014)). We stressed that the record was "devoid of any detail" that plaintiffs would run advertisements in the future, particularly in the upcoming November 2020 election. <u>Id.</u> Thus, we concluded that, "[a]t best, [the plaintiffs] have shown only that there is a theoretical possibility that the same controversy will recur with respect to them." <u>Id.</u>

D. <u>Current Litigation</u>

This action was brought by three plaintiffs: (1) No on E, San Franciscans Opposing the Affordable Housing Production Act ("the Committee"), a primarily formed independent expenditure committee that runs ads subject to

the secondary-contributor requirement; [4] (2) Todd David, the founder and treasurer of No on E (and the founder of Yes on Prop B); and (3) Edwin M. Lee Asian Pacific Democratic Club PAC Sponsored by Neighbors for a Better San Francisco Advocacy ("Ed Lee Dems"), a committee and a direct contributor to No on E, whose major donors would be subject to disclosure in ads under the San Francisco ordinance. David established the Committee to support the passage of Prop B in the June 7, 2022 election. The Committee sought to communicate its message by publishing mailers, print ads in newspapers, and digital ads on the internet.

As of May 10, 2022, the Committee had raised a total of $15,000 from three donors, each of which contributed $5,000. Two of those donors were committees that, in turn, had donors that had made contributions of more than $5,000. Thus, according to the examples provided by Plaintiffs, San Francisco's ordinance would require the following disclaimer on the Committee's print and video advertisements:

Ad paid for by San Franciscans Supporting Prop. B 2022. Committee major funding from:

1. Concerned Parents Supporting the Recall of Collins, Lopez and Moliga ($5,000) – contributors include

---

[4] The lead plaintiff in this suit was known as "San Franciscans Supporting Prop B" throughout the district court litigation. On appeal, and after the conclusion of the June 7, 2022 election, the case caption was updated to reflect the fact that the Committee rededicated itself to opposing Proposition E and changed its name, as required by California Government Code section 84107.

NO ON E V. DAVID CHIU                    13

Neighbors for a Better San Francisco Advocacy Committee
($468,800), Arthur Rock ($350,000).

2. BOMA SF Ballot Issues PAC ($5,000).

3. Edwin M. Lee Asian Pacific Democratic Club PAC
sponsored by Neighbors for a Better San Francisco
Advocacy ($5,000) – contributors include Neighbors for a
Better San Francisco Advocacy Committee ($100,000),
David Chiu for Assembly 2022 ($10,600).

Financial disclosures are available at sfethics.org.

On May 11, 2022, Plaintiffs filed this action. Plaintiffs
allege that the secondary-contributor disclaimer requirement
violates the First Amendment, both on its face and as applied
against Plaintiffs. In their prayer for relief, Plaintiffs request
a declaration that the requirement violates the First
Amendment, on its face and as applied to Plaintiffs; an
injunction barring enforcement of the secondary-contributor
requirement, in general and against Plaintiffs specifically;
and nominal damages.

On May 12, 2022, Plaintiffs filed a motion for a
preliminary injunction. Plaintiffs submitted a proposed
order requesting that the court "preliminarily [enjoin]
Defendants and their agents, officers, and representatives
from enforcing against Plaintiffs the on-communication
disclosure requirements for secondary donors at S.F. Code
§ 1.161(a)." In support of the motion for a preliminary
injunction, David submitted a declaration stating that,
"[b]ecause Concerned Parents and Ed Lee Dems are
committees, they have contributed $5,000 to the Committee,
and they both have donors who have given them $5,000 or
more, San Francisco's law will require that our Committee
report those secondary donors on our communications."

On June 1, 2022, the district court denied Plaintiffs'
motion. Plaintiffs timely appeal. We have jurisdiction over
this interlocutory appeal pursuant to 28 U.S.C. § 1292.

## DISCUSSION

To obtain a preliminary injunction, a plaintiff must
establish "that he is likely to succeed on the merits, that he
is likely to suffer irreparable harm in the absence of
preliminary relief, that the balance of equities tips in his
favor, and that an injunction is in the public interest." Winter
v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008). On appeal,
Plaintiffs argue primarily that they have demonstrated a
likelihood of success on the merits. See Garcia v. Google,
Inc., 786 F.3d 733, 740 (9th Cir. 2015) (en banc) ("The first
factor under Winter is the most important—likely success on
the merits."). Below, we address (A) mootness, (B)
Plaintiffs' likelihood of success on the merits, and (C) the
remaining Winter factors.

### A. Mootness

Before turning to the merits, we first must establish that
we have jurisdiction. "[A] federal court loses its jurisdiction
to reach the merits of a claim when the court can no longer
effectively remedy a present controversy between the
parties." Protectmarriage.com—Yes on 8, 752 F.3d at 836.
Defendants maintain that, because the June 2022 election
has occurred, Plaintiffs can no longer receive meaningful
relief and this appeal is moot. Although the June 2022
election has passed, this appeal is not moot because this
controversy is "capable of repetition, yet evading review."
FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 462 (2007).

The "capable of repetition, yet evading review"
exception to mootness applies when "(1) the challenged

action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." Id. (citation and internal quotation marks omitted). Defendants do not dispute that Plaintiffs have satisfied the first prong of that test. See Protectmarriage.com—Yes on 8, 752 F.3d at 836 (describing an election as a controversy of inherently limited duration).

"The second prong of the capable of repetition exception requires a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." Wis. Right to Life, 551 U.S. at 463 (citation and internal quotation marks omitted). But that standard does not require Plaintiffs to establish a certainty that they will be subject to the same enforcement: "Requiring repetition of every 'legally relevant' characteristic of an as-applied challenge—down to the last detail—would effectively overrule this statement by making this exception unavailable for virtually all as-applied challenges." Id. Plaintiffs bear the burden of showing that the "capable of repetition" prong is satisfied. Lee v. Schmidt-Wenzel, 766 F.2d 1387, 1390 (9th Cir. 1985).

On this record, Plaintiffs have met that burden with respect to at least one plaintiff.[5] David has a demonstrated history of establishing committees that run advertisements that are subject to the secondary-contributor requirement,

---

[5] Although Plaintiffs' motion for a preliminary injunction did not include a facial challenge, the relief sought by Plaintiffs was not limited to the June 2022 election. Instead, Plaintiffs asked the court to preliminarily enjoin Defendants from enforcing the secondary-contributor requirement against Plaintiffs indefinitely.

and he has twice engaged in litigation on this same issue. He also has clearly expressed his intent to continue those activities, unlike the plaintiffs in the earlier suit. Plaintiffs' complaint alleges that David "will engage in materially and substantially similar activity in the future, establishing committees and using them to speak about San Francisco candidates and measures." (Emphasis added). In support of Plaintiffs' motion for a preliminary injunction, David averred that he "will continue to create primarily formed committees in future elections, to share ads and communications substantially and materially similar to those we wanted to share in 2020 and that we want to share now." (Emphasis added).

Defendants offer no persuasive reason to doubt David's affidavit, which is supported by his past practice. See Wis. Right to Life, 551 U.S. at 463–64 (holding that there was a reasonable expectation that the same controversy would recur where plaintiff "credibly claimed that it planned on running 'materially similar' future targeted broadcast ads" and "sought another preliminary injunction based on an ad it planned to run" during another blackout period). Accordingly, this appeal is not moot, because it falls within the exception for controversies that are "capable of repetition, yet evading review." See Hum. Life of Wash. Inc. v. Brumsickle, 624 F.3d 990, 1001–02 (9th Cir. 2010) (concluding that there was a reasonable expectation that the controversy would recur because the plaintiff was a politically active organization that had been heavily involved in public debates in the past and intended to undertake future communications); Porter v. Jones, 319 F.3d 483, 490 (9th Cir. 2003) (rejecting mootness argument because plaintiff had expressed intent to create a similar website in future elections); Baldwin v. Redwood City, 540

F.2d 1360, 1365 (9th Cir. 1976) (holding that an issue is "capable of repetition, yet evading review" where the record established that plaintiff had continuing interest in and past practices of participating in local political campaigns by creating signs).

### B.  Likelihood of Success on the Merits

Plaintiffs seek a preliminary injunction on the ground that the secondary-contributor disclaimer requirement violates the First Amendment.  We hold that the district court acted within its discretion to conclude that Plaintiffs did not establish a likelihood of success on the merits.

The district court applied "exacting scrutiny," which "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."  Citizens United v. FEC, 558 U.S. 310, 366–67 (2010) (quoting Buckley v. Valeo, 424 U.S. 1, 64 (1976) (per curiam)).  On de novo review, Fyock, 779 F.3d at 995, we hold that exacting scrutiny is the correct legal standard.

Regardless of the beliefs sought to be advanced by association, "compelled disclosure requirements are reviewed under exacting scrutiny."  Ams. for Prosperity Found. v. Bonta, 141 S. Ct. 2373, 2383 (2021) (opinion of Roberts, C.J.); see also id. at 2396 (applying exacting scrutiny to First Amendment challenge to compelled disclosure) (Sotomayor, J., dissenting).  In the electoral context, both the Supreme Court and our court have consistently applied exacting scrutiny to compelled disclosure requirements and on-advertisement disclaimer requirements.  See Citizens United, 558 U.S. at 366–67 (holding that disclaimer and disclosure requirements are subject to exacting scrutiny); John Doe No. 1 v. Reed, 561 U.S. 186, 196 (2010) (applying exacting scrutiny to

disclosure requirement); Buckley, 424 U.S. at 64 (requiring that compelled disclosure requirements survive exacting scrutiny); Davis v. FEC, 554 U.S. 724, 744 (2008) (evaluating whether disclosure requirements satisfy exacting scrutiny); Brumsickle, 624 F.3d at 1005 (applying exacting scrutiny to Washington law that required disclaimers on political advertising and disclosure of certain contributions and expenditures); see also Family PAC v. McKenna, 685 F.3d 800, 805–06 (9th Cir. 2012) ("Disclosure requirements are subject to exacting scrutiny.").[6]

Plaintiffs' argument to the contrary is unavailing. Plaintiffs take the position that disclaimer and disclosure are "terms of art," and argue that the City's ordinance should be reviewed under strict scrutiny because it is a "hybrid disclaimer/disclosure requirement." But Plaintiffs cite no authority that makes a similar distinction.[7] Indeed, they

---

[6] In ACLU of Nevada v. Heller, 378 F.3d 979 (9th Cir. 2004), we held that strict scrutiny applied to statutes that affect the content of election communications. 378 F.3d at 987. But we have since acknowledged that intervening Supreme Court decisions clarified that we apply exacting scrutiny to disclosure and disclaimer requirements. See Brumsickle, 624 F.3d at 1005 (citing John Doe No. 1, 561 U.S. at 196, and Citizens United, 558 U.S. at 366–67).

[7] Citing Americans for Prosperity Foundation v. Bonta, Plaintiffs further argue that San Francisco's "hybrid" requirement should be reviewed under strict scrutiny because "[t]he Supreme Court recently signaled that it may be increasing the scrutiny given to any disclosure regime." This reading of Americans for Prosperity Foundation clashes with a plain reading of the case and the manner in which other courts have applied it to disclaimer laws. See, e.g., Gaspee Project v. Mederos, 13 F.4th 79, 95 (1st Cir. 2021), cert. denied, 142 S. Ct. 2647 (2022); Smith v. Helzer, No. 3:22-CV-00077-SLG, 2022 WL 2757421, at *10 (D. Alaska July 14, 2022), appeal docketed, No. 22-35612 (9th Cir. argued Feb. 9, 2023). We hold that Americans for Prosperity Foundation does not alter the existing exacting scrutiny standard.

acknowledge that the Supreme Court has applied exacting scrutiny to <u>both</u> disclosure rules, <u>John Doe No. 1</u>, 561 U.S. at 196, <u>and</u> disclaimer requirements, <u>Citizens United</u>, 558 U.S. at 366–67.

The concerns that Plaintiffs suggest are uniquely implicated in this case animate the entirety of the exacting scrutiny standard: "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure." <u>Buckley</u>, 424 U.S. at 65. Courts have upheld other laws, even where there was some deterrent effect, because "[d]isclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' <u>Buckley</u>, 424 U.S., at 64, and 'do not prevent anyone from speaking,' <u>McConnell v. FEC</u>, 540 U.S. 93, 201 (2003)." <u>Citizens United</u>, 558 U.S. at 366 (citations altered). Any argument that the secondary-contributor requirement violates the First Amendment because of the length and content of the disclaimer is appropriately addressed as part of the exacting scrutiny analysis.

To survive exacting scrutiny, a law must satisfy all three steps of the inquiry. The threshold question is whether there is a "substantial relation" between the challenged law and a "sufficiently important" governmental interest. <u>Citizens United</u>, 558 U.S. at 366–67 (citation and internal quotation marks omitted); <u>see</u> <u>Ams. for Prosperity Found.</u>, 141 S. Ct. at 2384 (describing a substantial relation as "necessary but not sufficient"). Next, "[t]o withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." <u>Ams. for Prosperity Found.</u>, 141 S. Ct. at 2383

(quoting John Doe No. 1, 561 U.S. at 196) (internal quotation marks omitted). Finally, "[w]hile exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." Id.

Below, we assess (1) the relation between the secondary-contributor disclaimer requirement and the governmental interest; (2) whether the strength of that interest reflects the seriousness of the burden on Plaintiffs' First Amendment rights; and (3) whether San Francisco's ordinance is narrowly tailored to that interest.

> 1. Relation Between the Secondary-Contributor Disclaimer Requirement and Defendants' Interest

Defendants take the position that the secondary-contributor requirement serves their interest in providing information to voters about the source of election-related spending. A committee can circumvent California's on-advertisement disclaimer requirement and avoid including its top donors in a disclaimer by providing funding to another committee instead of running an advertisement directly. Defendants contend that the secondary-contributor requirement satisfies voters' need for additional information by making it more difficult to hide the sources of funding for political advertisements.

Courts have long recognized the governmental interest in the disclosure of the sources of campaign funding:

> [D]isclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the

> candidate in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

Buckley, 424 U.S. at 66–67 (internal quotation marks and citation omitted); see Cal. Pro-Life Council, Inc. v. Randolph, 507 F.3d 1172, 1179 n.8 (9th Cir. 2007) ("[I]n the context of disclosure requirements, the government's interest in providing the electorate with information related to election and ballot issues is well-established."), abrogated on other grounds as stated in Brumsickle, 624 F.3d at 1013.

"[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 791 (1978). As the role of money in politics has expanded, the public is faced with a "cacophony of political communications through which . . . voters must pick out meaningful and accurate messages." Cal. Pro-Life Council, Inc. v. Getman, 328 F.3d 1088, 1105 (9th Cir. 2003). Understanding what entity is funding a communication allows citizens to make informed choices in the political marketplace. Alaska Right to Life Comm. v. Miles, 441 F.3d 773, 793 (9th Cir. 2006); see Bellotti, 435 U.S. at 791–92 ("[The public] may consider, in making their judgment, the source and credibility of the advocate.");

Getman, 328 F.3d at 1105 ("Given the complexity of the issues and the unwillingness of much of the electorate to independently study the propriety of individual ballot measures, we think being able to evaluate who is doing the talking is of great importance.").

We have "repeatedly recognized an important (and even compelling) informational interest in requiring ballot measure committees to disclose information about contributions." Family PAC, 685 F.3d at 806. Disclosure of who is speaking "enables the electorate to make informed decisions and give proper weight to different speakers and messages." Citizens United, 558 U.S. at 371. "An appeal to cast one's vote a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another." Brumsickle, 624 F.3d at 1008. Thus, we conclude that, as in other cases, Defendants have a strong governmental interest in informing voters about who funds political advertisements.

It follows that the secondary-contributor requirement is substantially related to that interest. We have previously recognized that providing information to the electorate may require looking beyond the named organization that runs the advertisement. In ACLU of Nevada v. Heller, 378 F.3d 979 (9th Cir. 2004), for example, the plaintiffs challenged a Nevada statute that required printed election-related communications to include the names of the businesses, social organizations, or legal entities responsible for those communications. 378 F.3d at 981–83. We recognized that "individuals and entities interested in funding election-related speech often join together in ad hoc organizations with creative but misleading names." Id. at 994. Thus, we concluded that, "[w]hile reporting and disclosure

requirements can expose the actual contributors to such groups and thereby provide useful information concerning the interests supporting or opposing a ballot proposition or a candidate, simply supplying the name and address of the organization on the communication itself does not provide useful information—and that is all the Nevada Statute requires." Id.

While Heller is an anonymous speech case, we agree with Heller's reasoning, and find it relevant to the election disclaimer context.   The interests in "where political campaign money comes from," Buckley, 424 U.S. at 66 (citation omitted), and "in learning who supports and opposes ballot measures," Family PAC, 685 F.3d at 806, extend beyond just those organizations that support a measure or candidate directly.  Plaintiffs do not challenge California's law that requires an on-advertisement disclaimer listing the top three donors to a committee.  But those donors are often committees in their own right.  The secondary-contributor requirement is designed to go beyond the "ad hoc organizations with creative but misleading names" and instead "expose the actual contributors to such groups."  Heller, 378 F.3d at 994; see McConnell v. FEC, 540 U.S. 93, 128 (2003) (noting that "sponsors of [political] ads often used misleading names to conceal their identity" and providing examples), overruled on other grounds by Citizens United, 558 U.S. at 365–66.  In the context of San Francisco municipal elections, Defendants show that donors to local committees are often committees themselves and that committees often obscure their actual donors through misleading and even deceptive committee names.  Because the interest in learning the source of funding for a political advertisement extends past the entity that is directly

responsible, the challenged ordinance is substantially related to the governmental interest in informing the electorate.

Notwithstanding that relationship, Plaintiffs contend that the challenged ordinance actually <u>undermines</u> that interest. They take the position that the secondary-contributor requirement could cause confusion because a committee must list donors who may not have any position on the issue that the ad is addressing or who may not have known that their donation would be used to promote those views. But Plaintiffs provide no factual basis for their assumption that San Francisco voters are unable to distinguish between supporting a group that broadcasts a statement and supporting the statement itself. <u>See</u> <u>Wash. State Grange v. Wash. State Republican Party</u>, 552 U.S. 442, 454–55 (2008) (requiring more than "sheer speculation" of voter confusion). Additionally, adopting Plaintiffs' position could call into question the logic underlying decisions that uphold disclosure and disclaimer requirements as applied to primary donors. Those cases emphasize that the laws at issue further the governmental interest in revealing the source of campaign funding, not ensuring that every donor agrees with every aspect of the message. <u>Brumsickle</u>, 624 F.3d at 1005–08; <u>Getman</u>, 328 F.3d at 1104–07.

Plaintiffs' final argument—that any informational interest furthered by San Francisco's ordinance is outweighed by the corresponding limitation on time available for other speech—is similarly unavailing. It is well-established that "[d]isclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking." <u>Citizens United</u>, 558 U.S. at 366 (internal quotation marks and citations omitted). Even if Plaintiffs are correct that the governmental interest

is somewhat diminished in this instance because the
challenged ordinance requires disclosure of secondary
contributors instead of direct donors, that principle still
applies.

Thus, we hold that the district court did not abuse its
discretion by concluding that the secondary-contributor
disclaimer requirement is substantially related to
Defendants' informational interest.

### 2. Burden On First Amendment Rights

"To withstand [exacting] scrutiny, 'the strength of the
governmental interest must reflect the seriousness of the
actual burden on First Amendment rights.'" John Doe No.
1, 561 U.S. at 196 (quoting Davis, 554 U.S. at 744). It is
well-established that there is an important governmental
interest in providing voters with information about the
source of funding for political advertisements. Buckley, 424
U.S. at 66–67; Heller, 378 F.3d at 994; Family PAC, 685
F.3d at 806. Given the strength of that interest, we are not
persuaded by either of Plaintiffs' arguments that San
Francisco's ordinance impermissibly burdens their First
Amendment rights.

First, Plaintiffs assert that the required disclaimer
displaces an excessive amount of speech. As noted above,
Plaintiffs wished to use video ads and print ads. According
to David, the spoken disclaimer in video ads would take up
100% of a 15-second ad, 100% of a 30-second ad, and 53-
55% of a 60-second ad. David averred that the written
disclaimer in video ads would take up between 35% and 51%
of the screen for up to 33% of the ad's duration (either 10
seconds of an ad that is 30 seconds or longer, or the first 5
seconds of a 15-second ad). Finally, David declared that the
required disclaimer would take up 100% of a two-inch by

four-inch ad, 70% of a five-inch by five-inch ad, 35% of a five-inch by ten-inch ad, and 23% of the face of an 8.5-inch by 11-inch mailer.

In this litigation, Defendants consistently have stated that they would not enforce the disclaimer requirement where disclaimers take up most or all of an advertisement's space or duration. When Plaintiffs moved for an injunction in this action, Defendants offered to agree not to enforce San Francisco's ordinance with respect to print ads that were five-inches by five-inches or smaller, or to spoken disclaimers on digital and audio advertisements of 60 seconds or less. After Plaintiffs refused that offer, Defendants again took the position that they would not enforce the challenged ordinance where the "required disclaimer would consume the majority of Plaintiffs' advertisement." We thus consider only those ads in which the disclaimer would take up less than a majority of the ad. The required disclaimers that remain subject to enforcement are (1) the written disclaimer on video ads that would take up a portion of the screen for up to 33% of the ad's duration; and (2) the written disclaimer that would take up 35% of a five-inch by ten-inch ad or 23% of an 8.5-inch by 11-inch mailer.

We first consider the written disclaimer that the ordinance would require Plaintiffs to display for up to 33% of a video ad's duration. In Citizens United, the Supreme Court upheld a law that required 40% of a video advertisement's duration to be devoted to the display of a written disclaimer. 558 U.S. at 320, 366, 367–68. In the earlier litigation challenging San Francisco's ordinance, the district court relied on Citizens United and concluded that the secondary-contributor requirement was not unduly burdensome for ads in which the disclaimer took up less than

40% of the ad.  Yes on Prop B, 440 F. Supp. 3d at 1056–57.
The court found that, for those ads, the remaining space was
sufficient to communicate the plaintiffs' political message.
Id.  We find that reasoning to be persuasive.  Plaintiffs have
not shown that they are likely to succeed on the merits of
their argument that the secondary-contributor requirement is
an impermissible burden on speech because the display of a
written disclaimer for up to one-third of a video ad's duration
is excessive.

Nor are Plaintiffs likely to succeed on their claim that the
required disclaimers' occupation of up to 35% of a printed
ad impermissibly burdens their speech.  Plaintiffs rely
heavily on American Beverage Ass'n v. City & County of
San Francisco, 916 F.3d 749 (9th Cir. 2019) (en banc), to
support their assertion that the size of the disclaimer is
excessive here.  In that case, we invalidated a San Francisco
ordinance requiring that certain printed beverage
advertisements include a health warning that occupied at
least 20% of the advertisement.  Id. at 753–54.  Plaintiffs
correctly point out that the size of the disclaimer here is, at
least for some ads, greater than 20%; and they correctly point
out that the First Amendment provides greater protection to
election-related speech than to commercial speech.  United
States v. United Foods, Inc., 533 U.S. 405, 409–10 (2001).

But American Beverage differs from this case in two
critical ways.  First, the governmental interest in informing
voters about the source of funding for election-related
communications is much stronger and more important than
the governmental interest in warning consumers about the
dangers of sugar-sweetened beverages.  See, e.g.,
Brumsickle, 624 F.3d at 1005–06 (noting that, in the context
of political disclaimer laws, the "vital provision of
information repeatedly has been recognized as a sufficiently

important, if not compelling, governmental interest"); Yes on Prop B, 440 F. Supp. 3d at 1057 (stating that "the political context raises concerns not present in a commercial speech case").

Second, the constitutional problem in American Beverage was that the City required a disclaimer that was twice as large as necessary to accomplish the City's stated goals. 916 F.3d at 757. The challenged law mandated that, no matter the size of the ad, the health warning had to occupy at least 20% of the advertising space. Id. at 754. Here, by contrast, no evidence suggests that a smaller or shorter disclaimer would achieve the same effect as the required disclaimers. Unlike in American Beverage, where the ordinance mandated the entirety of the disclaimer's content and required that it occupy at least 20% of the ad, id. at 753–54, here a disclaimer's content and size vary, depending on the number of secondary contributors and on the size of the ad. Therefore, unlike in American Beverage, the size of the disclaimer here is closely tailored to the governmental interest of informing the public about the source of funding and is not greater than necessary to accomplish that goal. As the district court noted in the earlier litigation, the fact that the content of a required disclaimer "is a major factor contributing to its length suggests a smaller disclaimer would not be equally effective." Yes on Prop B, 440 F. Supp. 3d at 1057.

In short, we are unpersuaded by Plaintiffs' argument that the size of the required disclaimers on the ads that they wished to run presents an impermissible burden on their First Amendment rights. With respect to the ads now exempt under the amended statute, and in the circumstances in which Defendants have agreed not to enforce the ordinance, San Francisco's ordinance does not burden Plaintiffs' speech

such that "the intervention of a court of equity is essential in order effectually to protect . . . rights against injuries otherwise irremediable." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (citation and internal quotation marks omitted).

The second burden identified by Plaintiffs—that the secondary-contributor requirement violates their right to freedom of association and drives away potential donors— is likewise insufficient to outweigh the strength of the governmental interests. "It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who might otherwise contribute." Buckley, 424 U.S. at 68. But to support an exemption from a compelled disclosure requirement, Plaintiffs must show more than a "modest burden." Family PAC, 685 F.3d at 808; see Ams. for Prosperity Found., 141 S. Ct. at 2388–89 (concluding that petitioners had shown a "widespread burden on donors' associational rights" where there was evidence that petitioners and their supporters had been subjected to "bomb threats, protests, stalking, and physical violence," and hundreds of organizations expressed that they shared the petitioners' concerns).

Plaintiffs provided only two declarations in support of their contention that San Francisco's ordinance burdens their right to freedom of association. David asserts that "[p]otential donors have expressed concern to me about the secondary disclosure rules and are more reluctant to contribute to committees where their donors need to be disclosed." Ed Lee Dems asserts that it would have to withdraw its donations from the Committee and would have its own fundraising challenges if donors thought that their names might become public through the secondary-contributor requirement.

The district court was within its discretion to conclude that Plaintiffs failed to demonstrate that the secondary-contributor requirement "actually and meaningfully deter[s] contributors." Family PAC, 685 F.3d at 807. Plaintiffs have not provided evidence of any specific deterrence beyond some donors' alleged desire not to have their names listed in an on-advertisement disclaimer. See Family PAC, 685 F.3d at 806–08 (concluding that disclosure requirements presented only a modest burden without a showing of a significant risk of harassment or retaliation). That level of hesitation on the part of donors is insufficient to establish that the "deterrent effect feared by [Plaintiffs] is real and pervasive." Ams. for Prosperity Found., 141 S. Ct. at 2388.

Adopting Plaintiffs' view that a modest burden on their right to associate anonymously outweighs the informational interest would "ignore[] the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace." McConnell, 540 U.S. at 197 (quoting McConnell v. FEC, 251 F. Supp. 2d 176, 237 (D.D.C. 2003)), overruled in part on other grounds by Citizens United, 558 U.S. at 365–66. The modest burden imposed on the Plaintiffs is permissible when contrasted with the alternative: "Plaintiffs never satisfactorily answer the question of how uninhibited, robust, and wide-open speech can occur when organizations hide themselves from the scrutiny of the voting public." Id. (internal quotation marks omitted).

### 3. Narrow Tailoring

Under exacting scrutiny, "the challenged requirement must be narrowly tailored to the interest it promotes." Ams. for Prosperity Found., 141 S. Ct. at 2384. But this standard does not require "the least restrictive means of achieving that

end."  Id.  Despite the close fit between San Francisco's ordinance and the government's informational interest, Plaintiffs present two different arguments as to why the secondary-contributor requirement is insufficiently tailored. Neither argument is persuasive.

First, Plaintiffs argue that the requirement fails narrow tailoring because there are other available alternatives, such as making the same information available in an online database.  That suggestion misunderstands the relevant standard.  The secondary-contributor requirement must have a scope "in proportion to the interest served," but it need not represent the "single best disposition." McCutcheon v. FEC, 572 U.S. 185, 218 (2014) (plurality opinion) (internal quotation marks omitted).  Case law and scholarly research support the proposition that, because of its instant accessibility, an on-advertisement disclaimer is a more effective method of informing voters than a disclosure that voters must seek out. See Gaspee Project, 13 F.4th at 91 (holding that an on-ad donor disclaimer is "not entirely redundant to the donor information revealed by public disclosures" because it "provides an instantaneous heuristic by which to evaluate generic or uninformative speaker names"), cert. denied, 142 S. Ct. 2647 (2022); Majors v. Abell, 361 F.3d 349, 353 (7th Cir. 2004) (reasoning that because fewer people are likely to see reports to government agencies than notice in the ad itself, "reporting [is] a less effective method of conveying information"); Michael Kang, Campaign Disclosure in Direct Democracy, 97 Minn. L. Rev. 1700, 1718 (2013) ("Research from psychology and political science finds that people are skilled at crediting and discrediting the truth of a communication when they have knowledge about the source, but particularly when they have knowledge about the source at the time of the

communication as opposed to subsequent acquisition."). Given the realities of voters' decision-making processes amidst a "cacophony" of electoral communications, Getman, 328 F.3d at 1105–06, the district court was within its discretion to conclude that the secondary-contributor requirement has a scope in proportion to the City's objective.

Plaintiffs' second argument—that the requirement is not limited to donations that are earmarked for electioneering— does not change that conclusion. Plaintiffs cite two out-of-circuit cases in which courts concluded that disclosure laws were narrowly tailored, in part because the laws applied only to donations that were earmarked for electioneering. See Indep. Inst. v. Williams, 812 F.3d 787, 797 (10th Cir. 2016) (upholding Colorado constitutional provision that only required disclosure of donors who have specifically earmarked their contributions for electioneering purposes); Indep. Inst. v. FEC, 216 F. Supp. 3d 176, 190–92 (D.D.C. 2016) (three-judge panel holding that a large-donor disclosure requirement limited to donors who contribute $1,000 or more for the specific purpose of supporting the advertisement is tailored to advance the government's interest in informing the electorate of the source of the advertisement).**[8]** Those courts upheld laws that required

---

[8] Plaintiffs also cite Van Hollen, Jr. v. FEC, 811 F.3d 486 (D.C. Cir. 2016), in which the D.C. Circuit considered a challenge to an FEC rule requiring corporations and labor organizations to disclose only donations "made for the purpose of furthering electioneering communications" instead of all donations. 811 F.3d at 488 (citation and internal quotation marks omitted). But because the court in Van Hollen did not consider whether a campaign finance law violated the First Amendment, we do not find its analysis to be persuasive. See id. at 495, 501 (holding that the FEC's rule is consistent with the text, history, and purposes of the authorizing statute and is not an arbitrary and capricious exercise of the FEC's regulatory authority).

only disclosure of earmarked contributions. But neither court suggested that, or had occasion to consider whether, a law fails narrow tailoring unless it is limited to the disclosure of earmarked contributions.

And even though San Francisco's ordinance goes beyond donations that are earmarked for electioneering, it does not have an unconstrained reach. The challenged ordinance requires an on-advertisement disclaimer listing only the top donors to a committee that is, in turn, a top donor to a primarily formed committee. S.F. Code § 1.161(a)(1). Under California law, a primarily formed committee is formed or exists primarily to support candidates or ballot measures. Cal. Gov't Code § 82047.5. By donating to a primarily formed committee, a secondary committee necessarily is making an affirmative choice to engage in election-related activity.

If a secondary committee were to purchase and run an advertisement opposing a ballot measure directly, its top donors could be subject to California's disclaimer requirements, which Plaintiffs do not challenge. The application of that law does not depend on whether the top donors earmarked their contributions for electioneering, or on whether they support the content of the advertisement. The City's ordinance does not violate narrow tailoring just because the secondary committee funneled its donations through a separate committee instead of running its own advertisements.

Additionally, even if Plaintiffs' challenge to the City's requirement were to succeed, the secondary donors still would be subject to disclosure and publicly visible on government websites. Plaintiffs do not challenge those public disclosures of secondary donors, which occur whether

or not the donors earmarked their contributions. Assuming that those disclosures are permissible, as Plaintiffs do by failing to challenge their validity, we are not persuaded that a law requiring those same donors to be named in an on-advertisement disclaimer is insufficiently tailored.

Thus, we hold that the district court was within its discretion to conclude that Plaintiffs did not establish a likelihood of success on the merits.

C.  Remaining Preliminary Injunction Factors

The district court concluded that none of the remaining Winter factors weighed in favor of an injunction, in part because Plaintiffs' argument as to those factors largely relied on their position that they had demonstrated a likelihood of success on the merits. The same is true on appeal. We hold that the district court did not abuse its discretion by reaching that conclusion.

Without an injunction, Plaintiffs likely would be injured by the loss of some First Amendment freedoms, Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion), but that injury would be modest, Family PAC, 685 F.3d at 806. Defendants, however, have established that there is a strong public interest in providing voters with the information of who supports ballot measures. Brumsickle, 624 F.3d at 1008. Thus, the public interest and the balance of hardships weigh in favor of Defendants. See FTC v. Affordable Media, LLC, 179 F.3d 1228, 1236 (9th Cir. 1999) ("Under this Circuit's precedents, 'when a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight.'" (quoting FTC v. World Wide Factors, Ltd., 882 F.2d 344, 347 (9th Cir. 1989))).

**AFFIRMED.**

COLLINS, Circuit Judge, with whom CALLAHAN, IKUTA, BENNETT, R. NELSON, LEE, BRESS, BUMATAY, and VANDYKE, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I join Judge VanDyke's dissent, which persuasively explains why the panel's erroneous decision "threatens vital constitutional protections" and should have been reheard en banc. *See* J. VanDyke Dissent at 72. But there is an additional troubling aspect of the panel's decision that alone would have warranted rehearing en banc—namely, that it explicitly allows San Francisco to commandeer political advertising to an intrusive degree that greatly exceeds what our settled caselaw would tolerate in the context of *commercial* advertising. Although the remaining two judges on the original panel have now issued an amended opinion that tries to justify this upside-down view of the First Amendment's protections, the panel's reasoning and result remain indefensible.

**I**

As Judge VanDyke notes, San Francisco recently amended the challenged ordinance to exempt many small or short advertisements, thereby "addressing some of the most egregious ways" in which the ordinance's disclaimer requirements intruded into the political speech of the Plaintiffs. *Id*. at 52 n.6. The original panel decision correctly

summarized Plaintiffs' earlier contentions on this score as follows:

> . . . Plaintiffs assert that the required disclaimer displaces an excessive amount of speech. According to David [the founder of No on E], the spoken disclaimer would take up 100% of a 15-second ad, 100% of a 30-second ad, and 53-55% of a 60-second ad. David averred that the written disclaimer on video ads would take up between 35% and 51% of the screen for either 10 seconds of an ad that is 30 seconds or longer, or the first 5 seconds of a shorter ad. Finally, David declared that the required disclaimer would take up 100% of a two-inch by four-inch ad, 70% of a five-inch by five-inch ad, 35% of a five-inch by ten-inch ad, and 23% of the face of an 8.5-inch by 11-inch mailer.

*No on E, San Franciscans Opposing the Affordable Hous. Prod. Act v. Chiu*, 62 F.4th 529, 542 (9th Cir. 2023). The recent amendment creates an exemption from the requirement to disclose the top two major donors of committee contributors in the case of either "a print advertisement that is 25 square inches or smaller" or "an audio or video advertisement that is 30 seconds or less." *See* S.F. CAMPAIGN & GOV'T CONDUCT CODE § 1.161(a)(1)(A)–(B) (effective Aug. 27, 2023).

But that amendment does nothing to address Plaintiffs' objections that (1) the written disclaimer would take up "35% of a five-inch by ten-inch ad, and 23% of the face of an 8.5-inch by 11-inch mailer"; (2) "the written disclaimer

on video ads would take up between 35% and 51% of the screen" while displayed; and (3) the "spoken disclaimer would take up . . . 53-55% of a 60-second ad." *No on E*, 62 F.4th at 542. The panel's treatment of those objections, both in its original opinion and its amended opinion, raises additional concerns that warranted rehearing en banc.

## A

With respect to Plaintiffs' first two objections (concerning the amount of physical space occupied by the disclaimers), the panel's analysis—both in its original and amended opinion—is clearly contrary to controlling precedent.

## 1

The panel held in its original decision that the substantial percentages of physical space taken up by the disclaimers did not involve "an impermissible burden on speech." *No on E*, 62 F.4th at 542. The panel asserted that, in *Citizens United v. FEC*, 558 U.S. 310 (2010), "the Supreme Court upheld a law that required 40% of an advertisement to be devoted to a disclaimer," and the panel therefore concluded that the percentages devoted to disclaimers here left sufficient remaining space "to communicate the plaintiffs' political message." *No on E*, 62 F.4th at 542 (citing *Citizens United*, 558 U.S. at 320, 366–68). In a footnote, the panel attempted to distinguish our en banc decision in *American Beverage Association v. City & County of San Francisco*, 916 F.3d 749 (9th Cir. 2019) (en banc), in which we held that a San Francisco requirement that soda ads contain a health disclaimer occupying 20% of the ad's physical space was "unduly burdensome." *Id*. at 757. *American Beverage* was "inapposite," the panel claimed, because it was applying the standards for compelled commercial speech set forth in

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), and the "*Zauderer* test" involves "a separate inquiry that requires the defendant to prove that compelled commercial speech was neither unjustified nor unduly burdensome." *No on E*, 62 F.4th at 542 n.7. According to the panel, "[t]hat test differs from exacting scrutiny review, which applies to disclaimer and disclosure requirements in the electoral context." *Id*. That analysis, which the panel's amended opinion has now abandoned, was deeply flawed.

As an initial matter, the original panel decision was flatly wrong in suggesting that *Citizens United* supports upholding a disclaimer requirement that occupies 40% of the physical space of a printed advertisement. The referenced portion of *Citizens United* upheld a provision of federal law providing that "televised electioneering communications funded by anyone other than a candidate must include a disclaimer" stating who "is responsible for the content of this advertising" and that the "required statement must be made in a 'clearly spoken manner,' and displayed on the screen in a 'clearly readable manner' *for at least four seconds*." 558 U.S. at 366 (emphasis added) (citations omitted). The panel's reference to a "40%" requirement was apparently based on the fact that this four-second-minimum rule was upheld as applied to the plaintiff's 10-second ads in that case. *See id*. at 320, 367. But the requirement to display a concise disclaimer "on the screen in a 'clearly readable manner' for at least four seconds" of the ads' 10 seconds does *not* equate to taking over *40% of the physical space of a printed ad*, which is a substantially greater intrusion on the speaker's message.

Even more egregiously, the original panel opinion adopted a wholly implausible theory for distinguishing *American Beverage*, which invalidated a 20% physical-

occupation requirement for health warnings in printed ads for certain sugar-sweetened beverages. 916 F.3d at 757. It is true, as the panel noted, that *American Beverage* involved commercial speech and this case involves the "election context," which is "distinctive in many ways." *No on E*, 62 F.4th at 542 n.7 (citation omitted). It is also true that *American Beverage* was applying the "*Zauderer* test," and this case instead involves "exacting scrutiny review." *Id*. But these distinctions emphatically cut the other way. Election-related speech is distinctive in the sense that it receives a *higher* degree of constitutional protection than commercial speech. *See United States v. United Foods, Inc.*, 533 U.S. 405, 409–10 (2001). And *Zauderer* scrutiny differs from exacting scrutiny in the sense that it is a decidedly *lower* standard—lower even than the already more lenient standards applied to commercial speech generally. *See*, *e.g.*, *Milavetz, Gallup & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010) (noting that the *Zauderer* test is even less demanding than the normal standards applied to regulation of commercial speech under *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980)). By affording greater First Amendment protection to soda ads than to core political speech, the original panel decision thus got the First Amendment analysis exactly backwards.

**2**

The two-judge quorum remaining from the original panel has now issued an amended opinion that takes another shot at trying to distinguish *American Beverage* and to defend the head-snapping proposition that government may commandeer a greater percentage of political ad space than it may for commercial advertising. This effort again fails.

The amended opinion now concedes that the core political speech at issue here is entitled to greater First Amendment protection than the soda ads at issue in *American Beverage*, where we invalidated, as unduly burdensome, a disclaimer that took up 20% of an ad's physical space. *See* Amended Opin. at 27. In nonetheless upholding a substantially more burdensome occupation of 35% or more of a political ad's physical space, the panel relies on two flawed points that only underscore the damage being done to the First Amendment in this case.

First, the panel declares that, although political speech is entitled to much greater First Amendment protection than soda ads, the City's corresponding interest in demanding highly detailed in-the-ad disclosures of indirect funding sources is so very much greater than the interest in disclosing the health risks of sugared beverages that—voilà—it more than swamps the greater protection afforded to political speech. *See* Amended Opin. at 27–28. Second, the panel asserts that the City is entitled to take as much space as it needs to set forth the required disclosures, so that the very verbosity of the mandated disclaimers necessarily requires that they occupy a large amount of physical space in the regulated political ad. *See id*. at 28. The panel's amended opinion thus combines (1) *ipse dixit* reflecting the panel's value judgments about the supposed weight of the asserted government interests and the relative importance of the different types of speech with (2) a whatever-it-takes approach to burdening political speech. This analysis bears little resemblance to the required "exacting scrutiny," under which "the strength of the governmental interest must reflect the seriousness of the *actual burden* on First Amendment rights." *Davis v. FEC*, 554 U.S. 724, 744 (2008) (emphasis added). Here, a consideration of those actual burdens

confirms that, as in *American Beverage*, the City's desire to commandeer more physical space in other people's speech must yield to the First Amendment.

In requiring the challenged additional disclosures, the City's ordinance piggybacks onto the disclosure requirements set forth in Chapter 4 of California's Political Reform Act, California Government Code § 84100 *et seq*. *See* S.F. CAMPAIGN & GOV'T CONDUCT CODE § 1.161(a). For printed ads, those disclosure requirements specify that the "disclosure area shall have a solid white background and shall be in a printed or drawn box on the bottom of at least one page that is set apart from any other printed matter." *See* CAL. GOV'T CODE § 84504.2(a)(1). Although the Political Reform Act only requires the text of disclaimers to be in "10-point" font, *see id*. § 84504.2(a)(2), the City's ordinance instead generally requires the use of "14-point, bold font," *see* S.F. CAMPAIGN & GOV'T CONDUCT CODE § 1.161(a)(3). Given these baseline requirements, the blizzard of additional words required by the City's ordinance results in a substantial takeover of the physical space of the regulated political ads, as illustrated in the following example of a supposedly "full-page" ad contained in the record below:



NO ON E V. DAVID CHIU                                    43

*American Beverage* properly recognized that, at some point, the sheer size and intrusiveness of a disclaimer requirement threaten to "drown out" the speaker's message and even to "effectively rule out the possibility of having an advertisement in the first place."    916 F.3d at 757 (simplified); *see also National Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (*NIFLA*) (making a similar observation in striking down required disclaimers in the advertisements of certain unlicensed providers of "pregnancy-related services").    As the above illustration shows here, taking such a large percentage of the physical space of an ad inevitably dilutes the speaker's message in a way that crowds out that message and impedes its effectiveness.    Viewed in light of "the seriousness of the actual burden on First Amendment rights," *Davis*, 554 U.S. at 744, the panel's take-as-much-as-you-need approach to burdening political speech is flatly contrary to *American Beverage* and *NIFLA* and is anathema to the First Amendment.

The panel's defense of the City's physical-occupation requirement for videos fares no better.    For starters, the panel's amended opinion inexplicably ignores the percentage of the physical space consumed by the required visual video disclaimer and instead addresses only the percentage of *time* in which that disclaimer must be displayed.[1]    Assuming that the panel is implicitly relying on

---

[1] The omission is apparently an artifact of the panel's effort to fix the original opinion's mistaken use of *Citizens United*'s discussion of *temporal* percentage requirements to justify *physical* percentage requirements.    *See supra* at 38.    But in un-crossing those wires, the panel's amended opinion now fails to directly address Plaintiffs' objection that, when displayed, the visual video disclaimer occupies between 35% and 51% of the physical space of the screen.

the same whatever-the-government-needs approach to a disclaimer's physical occupation of an ad, that reasoning is equally defective in the video context. Once again, the challenged ordinance's disclaimer requirements piggyback onto the requirements of the Political Reform Act. The baseline established by that Act is that the required disclaimers must "appear on a solid black background on the entire bottom one-third of the television or video display screen," *see* CAL. GOV'T CODE § 84504.1(b)(1), but here the City's much lengthier disclosure requirements will often require more than one-third of the screen. The resulting intrusion into the physical space of the video ad is illustrated by the following example in the record:



This commandeering of such a substantial portion of the visual space of the ad raises concerns comparable to those discussed earlier about crowding out the speaker's message and impeding effective communication. This sort of significant intrusion into political speech greatly exceeds

what the Supreme Court upheld in *Citizens United*, in which
the challenged disclaimer had to be "displayed on the screen
in a 'clearly readable manner' for at least four seconds" and
consisted of (1) the statement that "_____ is responsible
for the content of this advertising"; (2) a statement that the
communication "is not authorized by any candidate or
candidate's committee"; and (3) "the name and address (or
Web site address) of the person or group that funded the
advertisement." 558 U.S. at 366 (quoting 2 U.S.C. § 441d
(2006)).

Under *American Beverage* and *NIFLA*, the challenged
ordinance's commandeering of 23%, 35%, or even 51% of
the physical space of a political ad is unduly burdensome and
violates the First Amendment.

**B**

With respect to Plaintiffs' third objection (concerning
the required spoken disclaimers), the panel has not even
attempted—either in its original opinion or its amended
opinion—to defend the constitutionality of having spoken
disclaimers take up *more than half* of a 60-second audio or
video ad.   Indeed, the patent unconstitutionality of the
resulting burdens is underscored by the fact that this
commandeering of more than half of the speaking time in a
video ad is imposed *on top of* the already unduly burdensome
seizure of 35% to 51% of the ad's visual space for as much
of a third of the ad's running time. Rather than defend this
obviously unconstitutional restriction, the panel assumed
that such an application of the challenged ordinance would
raise serious constitutional issues, but it nonetheless upheld
the denial of a preliminary injunction on that score as
unnecessary.   *No on E*, 62 F.4th at 542–43; *see also*
Amended Opin. at 25–26.   It is unnecessary, the panel

concluded, because San Francisco has committed, on the record, not to enforce the "spoken disclaimers on digital and audio advertisements of 60 seconds or less." *No on E*, 62 F.4th at 543; *see also* Amended Opin. at 26. This reasoning is also clearly wrong.

In its recently enacted amendment, San Francisco has specifically exempted *only* audio or video ads of "30 seconds or less," rather than 60 seconds or less. By conspicuously adopting a *lesser* cut-off than the one it had committed to follow in the district court and in this court, San Francisco has called into question the reliability of the representations on which the panel relied. San Francisco's manifest effort to hang on to a portion of an ordinance that it simultaneously insists to us that it will never enforce is deeply troubling. We should not tolerate this kind of coyness from government litigants, especially when it comes to constitutional rights. On this score, the panel was wrong to uncritically accept San Francisco's representations, which provide insufficient grounds for declining to preliminarily enjoin enforcement of this aspect of the ordinance against ads of 60 seconds or less.

**II**

The astonishing result of the panel's erroneous decision is that the jurisprudence of this circuit now affords more robust constitutional protection to ads hawking sugary beverages than to core political speech about ballot initiatives. That defies both controlling precedent and common sense. We should have reheard this case en banc, and I respectfully dissent from our failure to do so.

VANDYKE, Circuit Judge, joined by CALLAHAN, IKUTA, BENNETT, R. NELSON, COLLINS, LEE, BRESS, and BUMATAY, Circuit Judges, dissenting from the denial of rehearing en banc:

The panel in *No on E v. Chiu* upheld an election disclosure regulation that burdens Plaintiffs' First Amendment speech and association rights, and that will inevitably result in voter confusion. It did so on the ground that the law advances the government's interest in educating the electorate. That ruling subverts the First Amendment rights of many San Franciscans and encourages increasingly onerous compelled disclosure laws that will similarly fail to advance an important government interest. This is not the exacting scrutiny the Supreme Court reminded our circuit to undertake when it reversed us only two years ago. *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021).

Proposition F, a recently adopted San Francisco election regulation, burdens associational and speech rights in at least two ways.[1] First, Proposition F burdens the associational rights of political speakers and their contributors (and even their contributors' contributors) by requiring political speakers to disclose on political advertisements the names of both their own contributors and their contributors' contributors. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam). Second, Proposition F burdens political speakers' speech rights by requiring they change their message to (ostensibly) advance the government's informational interests. *See ACLU of Nev. v. Heller*, 378

---

[1] Proposition F is unrelated to the ballot measure that Plaintiff No on E was formed to oppose.

F.3d 979, 988 (9th Cir. 2004); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988).

Election disclosure requirements that burden First Amendment rights are evaluated under "exacting" scrutiny.**[2]** *Ams. for Prosperity Found.*, 141 S. Ct. at 2383 (plurality opinion); *see Citizens United v. FEC*, 558 U.S. 310, 366 (2010). Exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Ams. for Prosperity Found.*, 141 S. Ct. at 2383 (plurality opinion) (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). A substantial relation mandates that "the rule requiring disclosure" "further[s]" or advances a sufficiently important government interest. *Acorn Invs., Inc. v. City of Seattle*, 887 F.2d 219, 225–26 (9th Cir. 1989). And a "disclosure regime[]" must also "be narrowly tailored to the government's asserted interest." *Ams. for Prosperity Found.*, 141 S. Ct. at 2383 (plurality opinion).

The panel erroneously concluded that Proposition F survives such scrutiny. To get there, it recited holdings indicating that the government has an important interest in informing voters about the source of funding for political advertisements. *See, e.g.*, *Fam. PAC v. McKenna*, 685 F.3d 800, 806 (9th Cir. 2012). The panel then leapt from those holdings to conclude that "[i]t follows" that a law requiring the on-ad disclosure of a political speaker's *contributors' contributors* is substantially related to that same government

---

[2] The caselaw typically labels an entity's on-ad identification of itself as a "disclaimer" and an entity's report to the state listing its top donors as a "disclosure." *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010). But because both are more intuitively understood as disclosures, I will refer to the law here as requiring on-ad disclosures.

interest. This leap was unwarranted: by contributing to the organization, contributors do not necessarily endorse other entities that the organization may choose to fund. A man may be known by the company he keeps, but not by the company that his company keeps, particularly when his company's company isn't also his company. Put differently, a man may be known by the company that *he* opts to keep, but he is not known by company once-removed with whom he has not opted to associate or disassociate—indeed, who he may not even know exists. Nor is the panel's leap precedented. Until this case, we have never blessed the compelled disclosure of secondary contributors. Our court should have taken the opportunity to correct en banc this unjustified First Amendment intrusion. I respectfully dissent.

## I. BACKGROUND

### A. Regulatory Background

California requires thorough disclosures from those engaged in political action. Many of these regulations target entities defined as "committees" under California law.[3] California requires such committees to file periodic reports, disclosing many of their contributors. Cal. Gov't Code § 84211. California also requires these committees to list

---

[3] A committee is "any person or combination of persons who directly or indirectly … [r]eceives contributions totaling two thousand dollars ($2,000) or more in a calendar year," "[m]akes independent expenditures totaling one thousand dollars ($1,000) or more in a calendar year," or "[m]akes contributions totaling ten thousand dollars ($10,000) or more in a calendar year to or at the behest of candidates or committees." Cal. Gov't Code § 82013.

their top contributors on their advertisements.[4] *Id.* §§ 84501(c), 84503. When a committee runs political advertisements, it must include on the ad the identity of who paid for the ad, *i.e.*, the name of the committee, and list the committee's top three contributors of "fifty thousand ($50,000) or more." *Id.* §§ 84501(c), 84502, 84503.

Perhaps thinking that it never hurts to have more of a good thing—in this case, compelled disclosure—San Francisco in 2019 adopted Proposition F. Proposition F increased the disclosure "requirements for primarily formed independent expenditure [and ballot measure] committees." S.F. Campaign & Governmental Conduct Code ("S.F. Code") § 1.161(a). Primarily formed committees are those "formed or exist[ing] primarily to support or oppose … [a] single candidate," "[a] single measure," "[a] group of specific candidates being voted upon in the same city, county, or multicounty election," or "[t]wo or more measures being voted upon in the same city, county, multicounty, or state election." Cal. Gov't Code § 82047.5; S.F. Code § 1.161(a). Proposition F requires primarily formed committees to provide on-ad disclosures of their top contributors of $5,000 or more (down from the $50,000 minimum established by state law). S.F. Code § 1.161(a). Of particular importance here, Proposition F also requires that the on-ad disclosure list, for those of the committee's top contributors that are themselves committees, the name

---

[4] California law defines advertisements for purposes of the on-ad disclosure requirement as those "general or public communication[s] that [are] authorized and paid for by a committee for the purpose of supporting or opposing a candidate or candidates for elective office or a ballot measure or ballot measures." Cal. Gov't Code § 84501(a)(1).

and contribution amount of those contributors' top two contributors of $5,000 or more. *Id.* § 1.161(a)(1).[5]

Proposition F and its implementing regulations govern how committees must list these contributors on their ads. That ordinance requires that each disclaimer required by California law or Proposition F be followed, in the same format as the disclaimer itself, by this phrase: "Financial disclosures are available at sfethics.org." *Id.* § 1.161(a)(2). For print advertisements, Proposition F requires all the on-ad disclosures be "printed in at least 14-point, bold font." *Id.* § 1.161(a)(3).    For audio and video advertisements, Proposition F's disclaimers must be "spoken at the beginning of such advertisements," but Proposition F does not require they "disclose the dollar amounts of contributions." *Id.* § 1.161(a)(5).  Implementing regulations impose even more specific requirements, down to the placement of em dashes and the number of spaces separating items in certain parts of the disclosure. *See* S.F. Ethics Comm'n Reg. ("S.F. Reg.") § 1.161-3(a).  To use Plaintiff No on E as an example, its print on-ad disclosure would appear as follows in the required 14-point bold font:

### Ad paid for by San Franciscans Supporting Prop. B 2022. Ad Committee's Top Funders:

**1. Concerned Parents Supporting the Recall of Collins, Lopez and Moliga ($5,000) – contributors include Neighbors for a Better San Francisco Advocacy Committee ($468,800), Arthur Rock ($350,000).**

---

[5] Partially adopting the parties' convention, I refer to the committee issuing an ad as the "political speaker," the political speaker's top contributors as "primary contributors," and the primary contributors' top contributors as "secondary contributors."

### 2. BOMA SF Ballot Issues PAC ($5,000).

### 3. Edwin M. Lee Asian Pacific Democratic Club sponsored by Neighbors for a Better San Francisco Advocacy ($5,000) – contributors include Neighbors for a Better San Francisco Advocacy Committee ($100,000), David Chiu for Assembly 2022 ($10,600).

### Financial disclosures are available at sfethics.org.

This requirement, facially onerous and visually cumbersome, drowns the political speaker's message in disclosure.[6]

### B. This Litigation

Todd David, "long … active in San Francisco politics," formed San Franciscans Supporting Prop B ("SPB"). After the June 2022 election where San Franciscans adopted Proposition B, SPB changed its name twice in short succession, ending with its current name, No on E.[7] SPB

---

[6] After Plaintiffs in this case petitioned for rehearing en banc, San Francisco amended the regulation to exempt certain small advertisements, thus addressing some of the most egregious ways the regulation infringed on First Amendment rights. S.F. Bd. of Supervisors, Ordinance 186-23, File No. 221161 (July 28, 2023). San Francisco essentially codified the commitment that Defendants had earlier made to not enforce the regulation against certain smaller advertisements. I would submit that Proposition F fails such scrutiny in circumstances beyond just those exempted by the recent amendment.

[7] *See* S.F. Ethics Comm'n, San Franciscans Supporting Prop B 2022, FFPC 410, Filing ID 203483641 (Apr. 13, 2022), https://public.netfile.com/Pub2/RequestPDF.aspx?id=203483641; S.F. Ethics Comm'n, San Franciscans Supporting Prop B, FPPC 410 Amendment, Filing ID 204422769 (Aug. 12, 2022), https://public.netfile.com/Pub2/RequestPDF.aspx?id=204422769; S.F.

received contributions from three entities, Concerned Parents Supporting the Recall of Collins, Lopez, and Moliga; BOMA SF Ballot Issues PAC; and Edwin M. Lee Asian Pacific Democratic Club PAC ("Ed Lee Dems"). Each of these entities gave SPB $5,000, triggering Proposition F's requirement that SPB disclose them on their advertisements. Moreover, Ed Lee Dems and Concerned Parents are both committees who have received more than $5,000 from certain donors, triggering Proposition F's requirement that SPB disclose these secondary contributors. One of SPB's primary contributors, Ed Lee Dems, received funding from Neighbors for a Better San Francisco Advocacy Committee and David Chiu for Assembly 2022. One of SPB's other primary contributors, Concerned Parents, received funding from Neighbors for a Better San Francisco Advocacy Committee and Arthur Rock. These donors to Ed Lee Dems and Concerned Parents have not contributed to SPB monetarily or otherwise.

Proposition F inhibits SPB's contributors from freely associating with, and speaking through, SPB. Ed Lee Dems has financially contributed to SPB and supports the passage of Proposition B. But the treasurer for Ed Lee Dems declared that if SPB were to issue ads triggering Proposition F's on-ad disclosure requirement, then Ed Lee Dems would withdraw its support and request its money be returned. Withdrawal would be necessary because Ed Lee Dems's "[d]onors contribute to Ed Lee Dems to support any of its various goals and projects, and some donors do not support

---

Ethics Comm'n, No on E, San Franciscans Opposing the Affordable Housing Production Act, FPPC 410 Amendment, Filing ID 204444625 (Aug. 16, 2022), https://public.netfile.com/Pub2/RequestPDF.aspx?id=204444625.

all of its goals and projects." Some of these donors "would be upset to end up on disclaimers on issues that they have no interest in, or even [have] contrary positions on," such as SPB. These donors "would withdraw their support if they knew that Ed Lee Dems supported groups making communications that triggered such on-communication disclosure."

As an example of the confusion and compelled association Proposition F triggers, the treasurer for Ed Lee Dems reported receiving more than $5,000 from "David Chiu for Assembly 2022." But Chiu's 2022 candidacy for the assembly seat ended and he is now the City Attorney. Listing David Chiu for Assembly 2022 as a secondary contributor to SPB "would mislead voters into believing that the City Attorney is running for another office and improperly taking positions on issues, damaging Mr. Chiu's reputation."

Several Plaintiffs, consisting of Todd David, SPB, and Ed Lee Dems, sued San Francisco's City Attorney David Chiu and several other San Francisco authorities seeking and moving for injunctive relief from Proposition F and its implementing regulations. The district court denied the motion. Plaintiffs appealed, and the panel in this case affirmed. The panel concluded that "Plaintiffs did not establish a likelihood of success on the merits."

Purporting to apply exacting scrutiny, the panel determined that there was "a 'substantial relation' between [Proposition F] and a 'sufficiently important' governmental interest." In assessing the government's interest, the panel recited several cases that establish that interest is "in informing voters about who funds political advertisements." According to the panel, "[i]t follows" from that

informational interest that Proposition F "is substantially related to that interest." The panel reasoned that the contributors to committees running election advertisements might be committees themselves and ones with names that might "obscure their actual donors." The panel did not explain how voters would distinguish between secondary contributors that funnel money through primary contributors, and thus can reasonably be inferred to support the political speaker, and those with no relationship to the political speaker.

The panel further concluded that the governmental interest was sufficient given "the seriousness of the actual burden on First Amendment rights." At the end of its purportedly "exacting" scrutiny, the panel concluded that Proposition F was narrowly tailored to advance the government's interest. Plaintiffs petitioned for en banc rehearing.

## II. ANALYSIS

Despite the severe burdens on their First Amendment rights that Proposition F caused and will continue to cause Plaintiffs to suffer, the panel upheld the ordinance by identifying a government interest that is not advanced—and in fact is undercut—by the regulation. Our law requires more before we uphold government intrusions on speech and association rights. We should have corrected course.

### A. Proposition F Seriously Burdens Plaintiffs' Association and Speech Rights.

The First Amendment prohibits the government from "abridging the freedom of speech … or the right of the people peaceably to assemble." U.S. Const. amend. I.

Proposition F burdens Plaintiffs' rights to both free association and free speech.

### i. Proposition F Burdens Plaintiffs' Association Rights.

Defendants argued to the panel that Proposition F imposes no burden on association rights. Although the panel did not conclude that Proposition F imposes *no* burden on association rights, it did conclude that the burden was light in comparison to "the strength of the governmental interests." Before proceeding to exacting scrutiny, it is thus worth reviewing the severity of Proposition F's intrusion on association rights.

Proposition F burdens Plaintiffs' right of association in a peculiarly egregious fashion. The law exceeds California's requirement that political speakers disclose their top contributors on ads—a requirement that already seriously encroaches on the First Amendment's association guarantees. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Ams. for Prosperity Found.*, 141 S. Ct. at 2382. San Francisco's law instead compels unwanted associations by requiring political speakers to give the appearance of affiliation with secondary contributors, despite the lack of any affirmative act giving rise to such an association. And to be clear, as both a matter of logic and the law, forcing the appearance of association is a form of forcible association. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (explaining how forced affiliation can infringe the right of association).

Compelled disclosure of anonymous associations and compelled formation of association are both uncomfortable reminders of the ugly history of majoritarian groups forcing the disclosure of culturally unpopular minority associations.

*See Latta v. Otter*, 771 F.3d 456, 474 (9th Cir. 2014) ("[A] primary purpose of the Constitution is to protect minorities from oppression by majorities."); John D. Inazu, *The Unsettling "Well-Settled" Law of Freedom of Association*, 43 Conn. L. Rev. 149, 198 (2010) (noting the First Amendment right of assembly's history of "shielding dissident groups from a state-enforced majoritarianism throughout our nation's history"). As James Madison noted, "[i]f a majority be united by a common interest, the rights of the minority will be insecure." *The Federalist No. 51*, at 270 (George W. Carey & James McClellan eds., Liberty Fund 2001).

The clash of majoritarian power with private and unpopular associations found its paradigmatic display in *NAACP v. Alabama ex rel. Patterson*, where the Supreme Court upheld the NAACP's right to not disclose its membership rolls to the state of Alabama. 357 U.S. at 449. The need to protect vulnerable members of an unpopular association was nowhere more apparent than protecting members of the NAACP in the American South during the Civil Rights Era. The "identity of [NAACP's] rank-and-file members" in Alabama exposed the members to serious risk of reprisal for their membership, "adversely [affecting] the ability of [NAACP] and its members to pursue their collective effort[s]." *Id.* at 462–63. In *NAACP*, the Court upheld the NAACP's right to protect its *members* from identification with a culturally unpopular organization. *See id.* But the same right to anonymously associate also protects *organizations* from reprisal based on the membership of, or contributions from, culturally unpopular people and other organizations. Just as the NAACP members were at risk for reprisal in 1950s Alabama, so a candidate or ballot measure with unpopular supporters (or in

this case, supporters of supporters) can be at risk of reprisal when those supporters are forcibly disclosed. Likewise, an unpopular *speaker* who is forced to disclose the supporters of its supporters also puts those secondary supporters at a risk of reprisal, even though they may have no relationship (and may desire no relationship) with the speaker.

As is helpfully illustrated by the *NAACP* case, the mere fact that a compelled disclosure law is facially neutral doesn't prevent it from having an acute disparate impact on culturally unpopular groups. *Cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (explaining disparate impact occurs when "practices that are facially neutral in their treatment of different groups … in fact fall more harshly on one group than another"). Forcibly disclosing members of organizations advocating *for* segregation in 1950s Alabama would not have harmed those organizations in the same way as disclosing members of the NAACP would have. *See Ams. for Prosperity Found.*, 141 S. Ct. at 2388 (noting that "some donors might not mind—or might even prefer—the disclosure of their identities to the State"). When only a minority of the community supports an institution—such as the NAACP in Alabama of the 1950s—the public disclosure of a person's support for that institution may often invite reprisal. *See NAACP*, 357 U.S. at 462. In contrast, organizations and contributors that are culturally popular at a given time often do not risk similar harm by the surrounding community knowing of the association. The harms of compelled disclosure inevitably fall unevenly on the unpopular—that is, precisely those groups most in need of First Amendment protection.

But San Francisco's ordinance does not merely require disclosure of anonymous association, as is the case for California's on-ad disclosure law—it forces the formation of

associations.  We have no logical reason to think that either a political speaker in accepting a contribution from a primary contributor, or a secondary contributor in contributing to that primary contributor, necessarily have any desire to associate with one another.  The friends of your friend may want nothing to do with you—and vice versa.  Nonetheless, when it is time for a political speaker to create its advertisements, Proposition F requires the speaker to prominently display the secondary contributor's name.  *See* S.F. Code § 1.161(a).

In compelling these on-ad disclosures, Proposition F will cause the public to naturally infer second-degree associations between political speakers and secondary contributors, notwithstanding the absence of any logical basis to infer such an association actually exists. Advertisements containing the name of a political speaker (and the speaker's message) as well as the names of secondary contributors will lead many to infer an association between the speaker and the secondary contributor.  Such advertisements will often take the form of a radio ad that a citizen casually hears while driving to work or a poster someone sees from a distance while waiting in line to order his morning coffee, or any number of other ads delivered or consumed in a similarly fleeting manner.[8]  These citizens, who cannot rewind a radio ad or who must step forward in line and order coffee, will rarely enjoy sufficient time or

---

[8] Even the most non-fleeting of advertisements poses this same risk because of how advertisements are commonly treated by the deluged citizenry.  How often do people glance only for a moment at a detailed pamphlet they receive in the mail before throwing it in the garbage? Such a fleeting perusal of an otherwise thorough advertisement prompts quick inferences citizens would not make when situated to carefully consider the existence (or lack thereof) of a connection between political speakers and secondary contributors.

motivation to discern whether the secondary contributor actually endorses the political speaker. They will just remember the association (true or not) created by the mandatory disclosure. Indeed, that is precisely the result that Proposition F intends—otherwise, why compel such disclosure?

Of course, if an ordinary citizen fully understood that the sole connection between a political speaker and a secondary contributor is that the secondary contributor gave money to an organization (the primary contributor) that then independently chose to give money to the political speaker, that ordinary citizen would not rationally infer any necessary association between the political speaker and the secondary contributor. People do not ordinarily assume an association necessarily exists between, say, a non-profit who receives money from a synagogue and that synagogue's top contributors.[9] Proposition F thus causes the busy public to infer an association that people ordinarily would not infer if they had time or reason to fully understand the tenuous connection between political speakers and secondary contributors.

---

[9] A "committee" need not be *exclusively* political under California law and can be a multipurpose organization. *See* Cal. Gov't Code §§ 82013(a) (defining a committee as a "combination of persons" that receives at least $2,000 a year in contributions), 82015(a)–(b) (defining a contribution as payment without consideration that is unambiguously for a "political purpose[]" even if given to a "multipurpose organization"), 84222(a) (defining a multipurpose organization as, inter alia, "a civic organization[ or] a religious organization"). So a synagogue that solicits and receives at least $2,000 in donations that are for the synagogue to engage in a political function would be classified under California law as a committee, and those synagogue members who have given would be classified as contributors.

It is difficult to "think of [a] heavier burden on … associational freedom" than "forced association." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 581–82 (2000) (holding unlawful a law "forc[ing] petitioners to" open "their candidate-selection process … to persons wholly unaffiliated with the party"). After all, "the freedom to associate for the common advancement of political beliefs necessarily presupposes the freedom" of an organization to identify its members "*and to limit the association to those people only*." *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (1981) (cleaned up; emphasis added); *see Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) ("The right to eschew association for expressive purposes is likewise protected [under the First Amendment].").

That harm is starkly visible in this litigation. Plaintiff committee No on E—earlier known as SPB—received funding from Ed Lee Dems, which received funding from David Chiu for Assembly 2022. Listing David Chiu for Assembly 2022 as a donor on No on E's ads forces the appearance of association between Chiu, the current City Attorney for San Francisco *defending this lawsuit*, and No on E. The forced association created by listing Chiu on the ad is particularly problematic because the City Attorney is prohibited from taking positions on ballot measures.

Despite their attempts to argue otherwise, Defendants confirmed in their briefing that the appearance of secondary contributors on these ads will, in fact, create a perception of association. First, Defendants devoted six sentences in their briefing to explaining that City Attorney David Chiu cannot and has not supported any ballot measures, even though his organization, David Chiu for Assembly 2022, is a secondary contributor to SPB, a committee supporting ballot measure

Proposition B. Defendants, in other words, strived with these sentences to disassociate David Chiu from SPB. But while those six sentences may clarify confusion in the courtroom, those same sentences will not be available to most secondary contributors objecting to their forced association with a political advertisement or its speaker.

Defendants confirmed again that Proposition F forcibly associates presumptive strangers, arguing that an on-ad disclosure is critical to effecting San Francisco's goal because voters do not have the time to research the funding of political speakers. Voters are indeed busy. As a result, many will infer an association between the political speaker and secondary contributors merely from the appearance of the secondary contributor's name on a political advertisement. The ignorance of voters that Defendants relied upon to justify Proposition F's required disclosures undercuts any argument that such voters will *not* be misled when they glimpse a bunch of names in apparent association with each other.

In upholding Proposition F, the panel made two additional points that should not be understood to indicate that Proposition F causes anything short of a severe intrusion upon associational rights.[10] First, the panel noted that "[b]y donating to a primarily formed committee, a secondary committee necessarily is making an affirmative choice to engage in election-related activity." True enough. But the problem is not that secondary contributors are being forcibly drawn into electoral politics—the problem is that secondary contributors are being forcibly associated with entities with

---

[10] The panel raised these arguments in its analysis of narrow tailoring. Because Proposition F fails on the first element of exacting scrutiny and I therefore need not address narrow tailoring, I address them here.

whom they never sought to associate. One should not be subjected to undesired and illogical forced associations merely because he voluntarily entered the political arena.

Second, the panel noted that "even if Plaintiffs' challenge" was successful, "secondary donors still would be subject to disclosure and publicly visible on government websites." But this fact is irrelevant for purposes of assessing the burden on Plaintiffs' associational rights. The disclosure of such second-order connections through official records, which are usually investigated by those prepared to carefully consider whether an association *necessarily* exists, will not risk the false inferences generated by on-ad disclosures.[11]

### ii. *Proposition F Burdens Plaintiffs' Right to Speak.*

In addition to its burden on Plaintiffs' associational rights, Proposition F burdens Plaintiffs' speech rights.

---

[11] The reason that Proposition F causes a materially different risk of reprisal from the status quo disclosures—*i.e.*, those in the official records—should be clear enough when we consider who ordinarily investigates the official records and why: a journalist learning about a political speaker or funder, for the purpose of highlighting what that journalist believes to be an unflattering association. But journalists meticulously poring over official records are better equipped to draw reasonable inferences from the data than a citizen bombarded by advertisements during election season. And the standard practice of a journalist engaging in such work is to solicit comments from parties the journalist investigates. That request gives the discussed party the chance to disclaim an endorsement of the political speaker or the speaker's message (or, if the discussed party is a secondary contributor, to disclaim any association with the speaker at all). Political speakers and secondary contributors suffer a far different and smaller intrusion into their associational rights from investigations into public records than the intrusion suffered by those parties from Proposition F's forced on-ad disclosures.

Indeed, it directly targets one of the fundamental reasons for the First Amendment: protecting political speech. *See Meyer v. Grant*, 486 U.S. 414, 425 (1988) (recognizing that "the importance of First Amendment protections is 'at its zenith'" when a law regulates political speech); *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

Plaintiffs obviously engage in political speech when issuing advertisements to promote a candidate or a political issue. *See Mills v. Alabama*, 384 U.S. 214, 218 (1966). Proposition F requires that they modify their speech by adding a list of (potentially nine) names and the amount that each of those persons or entities contributed. For print ads, these names must be in 14-point bold font, notwithstanding how much the sheer volume of the disclosure may dilute or distract from the speaker's desired message, and even if the message itself is as short as "Vote for Pedro" or "Save Ferris." S.F. Code § 1.161(a)(3). These disclosures "necessarily alter[] the content of the [advertisement]," burdening Plaintiffs' rights to free speech. *Riley*, 487 U.S. at 795; *see Citizens United*, 558 U.S. at 366 (subjecting "[d]isclaimer and disclosure requirements" to exacting scrutiny because they "may burden the ability to speak"). Proposition F thus burdens Plaintiffs' association and speech rights.

## B. Proposition F Fails Exacting Scrutiny Because It Lacks a Substantial Relation to an Important Government Interest.

Proposition F places onerous burdens on Plaintiffs' First Amendment rights, which demands the law withstand exacting scrutiny. The panel concluded Proposition F satisfies such scrutiny, reasoning that the law has a

substantial relation to the government's asserted "interest in informing voters about who funds political advertisements." That conclusion glosses over the distinction between primary and secondary contributors. San Francisco does not have a sufficiently important interest in requiring disclosure of secondary contributors—which in any event will likely only confuse many voters about who supports political ads.

> *i. San Francisco Has a Circumscribed and Limited Interest in Informing Voters About Political Speakers.*

No one denies that the government has an interest in informing voters about who is funding political ads. But the precise contours of that interest are important—"[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995). The government's informational interest that can justify burdens on First Amendment rights is the disclosure of information that helps voters understand who is speaking in a political advertisement.

"We have repeatedly recognized an important (and even compelling) informational interest in requiring ballot measure committees to disclose information about contributions." *Fam. PAC*, 685 F.3d at 806. The Supreme Court has said such disclosure "allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches." *Buckley*, 424 U.S. at 67. "An appeal to cast one's vote a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by

another." *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1008 (9th Cir. 2010). Our law does not assume that an organization and its financiers are precisely aligned on every issue, nor does it assume that disclosure serves the purpose of telling the world of such a precise alignment. But the premise on which the government's informational interest sits is that learning a political advertiser's financiers can serve as a reasonable proxy for informing the voter of where the speaker falls on the political spectrum. Or as I emphasized above, channeling the Greek moralist: "A man is known by the company he keeps." Aesop, *Aesop's Fables* 109 (R. Worthington, trans., Duke Classics 1884).

### ii. *Proposition F Does Not Advance a Sufficiently Important Government Interest.*

But man is not known by the company of the company he keeps. Proposition F does not advance any governmental information interest that our court has previously recognized. That is because a voter cannot reasonably infer any relevant information about a political speaker or an advertisement by knowing the speaker's secondary contributors. *Cf. Van Hollen, Jr. v. FEC*, 811 F.3d 486, 491, 497 (D.C. Cir. 2016) (recognizing that disclosing the names of donors who do not designate their contributions for "electioneering communications" would "convey some misinformation to the public about who *supported* the advertisements"). Secondary contributors may contribute to the primary contributor for a variety of reasons unrelated to the primary contributor's support for a political speaker. That is not merely a theoretical proposition; it is exactly what Plaintiff Ed Lee Dems's treasurer declared regarding Ed Lee Dems's contributors. And the government's interest in providing information about political speakers is not an interest in communicating *everything* about a political

speaker. *See McIntyre*, 514 U.S. at 348. Under the panel's logic, the government could require the disclosure of as many donation connections as it takes to show a given political speaker's degrees of separation from Kevin Bacon. Is that information about the political speaker? Sure. Is it relevant in any way to an arguable governmental interest? We should all hope not.

But worse than simply compelling the disclosure of information that furthers no sufficiently important governmental interest, Proposition F will actually encourage voters to draw inaccurate conclusions. When voters view these ads with their on-ad secondary contributor disclosures, one of two things will happen. Either the busy voter will be confused and believe that a secondary contributor—who has taken no action to support the advertisement or its speaker—endorses the speaker and the advertisement, or the voter will recognize that no relationship between the two can be inferred. The first, as explained earlier, is more likely to occur and not only fails to advance the government's interest in informing voters, it undermines that interest by *mis*informing the voter. And in the rare instances where voters properly draw no inference about a relationship between the speaker and secondary contributors, no governmental interest is furthered. Either way, Proposition F does not further any sufficiently important government interest.

The panel concluded that compelling the disclosure of secondary contributors advances the government's informational interests, but the three reasons it provided do not hold up. *First*, the panel reasoned that Proposition F advances the government's interests because primary donors "are often committees in their own right" and may use "creative but misleading names." This reasoning perhaps

explains *why* San Francisco adopted the ordinance, but it does not show that Proposition F advances San Francisco's informational interest. The interest might be advanced if voters could know, when they see a secondary contributor's name, whether that secondary contributor intentionally supported the political speaker and is only a secondary contributor because it is trying to hide the source of funding. But Proposition F's requirements will never provide such information through on-ad disclosures. Moreover, if it is true that many donors want to hide their identities, it stands to reason that most sophisticated election financiers will simply funnel their money through an additional opaquely named committee to avoid identification.[12]

*Second*, the panel concluded that we cannot infer that voters will be confused into believing secondary contributors endorse the speaker or message unless Plaintiffs advance affirmative proof of such confusion. But our court does not require empirical proof before it can reach a logical conclusion. *See Merrifield v. Lockyer*, 547 F.3d 978, 989 (9th Cir. 2008) (noting that, under rational basis review, "[t]he State is not compelled to verify *logical* assumptions with statistical evidence" (quotation omitted)). Common sense dictates that when election season brings on a deluge of political advertisements, voters will reflexively conclude a connection exists between an ad and the names that appear on it. Indeed, that perception of a connection is the whole

---

[12] Under California's disclosure laws—but seemingly not Proposition F's on-ad disclosure regime—a donor who earmarks donations and funnels the donation through multiple entities will still be disclosed as funding the political speaker. *See* Cal. Gov't Code § 85704; *see also id.* § 84501(c)(3). Of course, if that law did apply to Proposition F, then Proposition F advances no informational interest because the "true" contributor will already be disclosed.

purpose behind Proposition F's mandated disclosure of secondary contributors.  To pretend otherwise is to hide our judicial heads in the sand.

The Supreme Court's opinion in *Washington State Grange v. Washington State Republican Party*, which rejected a challenge on association grounds to Washington's ballot designating candidates with their "party preference," is not to the contrary.  552 U.S. 442, 444 (2008).  The Court in that case emphasized that the voting system had not yet "been implemented" and so the Court lacked "ballots indicating how party preference will be displayed.  It stands to reason that whether voters will be confused by the party-preference designations will depend in significant part on the form of the ballot." *Id.* at 455.  Although the Court would not speculate whether the form of a possible ballot could confuse voters, this case calls for no such speculation.  Here, we have the evidence that was missing in *Washington State Grange*: namely, the precise format and content of the on-ad disclosures required by Proposition F.

Moreover, as discussed above, when voters are not confused or misled, then Proposition F still does not advance the government's interest, because in that instance Proposition F effectively does nothing.  For those voters who are not confused, they will know that the identity of a secondary contributor merely allows them a chance to guess at whether the secondary contributor is (or isn't) supportive of the ad.  Encouraging voter speculation, which is the most that San Francisco can hope Proposition F accomplishes without misleading voters, does not advance any government interest.  *See Acorn Invs., Inc.*, 887 F.2d at 226.

*Third*, the panel insisted that there must be a substantial relation here because "adopting Plaintiffs' position could

call into question the logic underlying decisions that uphold disclosure and disclaimer requirements as applied to primary donors." This reasoning highlights that the panel failed to recognize the fundamental distinction between a primary contributor and a secondary contributor. As discussed above, the two are different not as a mere matter of degree, but in kind. We know a primary contributor supports the political speaker; we don't know whether the secondary contributor does. Indeed, we don't know whether the secondary contributor even *knows* the political speaker, or vice versa. Recognizing that Proposition F doesn't advance the government's informational interest is not at odds with our cases holding that the government's interest is advanced by disclosing primary contributors.

In sum, Plaintiffs suffered and will suffer severe burdens on their association and speech rights. The panel justified such burdens by pointing to a governmental interest that is not advanced by the burdensome law. The panel's scrutiny was "exacting" in name only.

## C. The Panel's Rationale Encourages Governments to Impose Even More Invasive On-Ad Disclosures.

The panel erroneously held that San Francisco may require primary committees to provide, when acting as political speakers, on-ad disclosure of their top contributors' top contributors. Its error, however, is not limited to depriving political committees and their contributors of their First Amendment rights of association and speech. The panel's reasoning sets no logical limit to how many layers of disclosures are necessary to find the true or original source of a political ad's funding.

Proposition F arbitrarily assumes that voters will be meaningfully informed if they know the identities of a political speaker's contributors' contributors. The government's supposedly animating concern is that political donors will hide behind clever committee names to hide the source of money if only disclosure of primary contributors is required. But the obvious workaround for Proposition F is to simply provide clever committee names for the secondary contributors too. So disclosing secondary contributors will not actually solve the problem—at least not for long. So what's next? Disclosure of tertiary (and quaternary, quinary, senary) contributors? Why not contributors even further removed from the political speaker? The problem with the panel's reasoning is that it will presumably permit, under the guise of "exacting scrutiny," any number of layers between a contributor and a political speaker, no matter how disconnected. Under the panel's logic, the on-ad disclosure of the contributors' contributors' contributors (and so on) will be substantially related (enough) to the government's informational interest.

For the same reasons that the on-ad disclosure of secondary contributors here is different in kind from a primary contributor, it is best to cut off the errant logic at its source. The reason a government cannot justify an interest in the compelled disclosure of five layers of contributors (that is, the disclosure of a political speaker's contributors' contributors' contributors' contributors' contributors) is precisely the same reason Proposition F fails any sort of heightened scrutiny: because a secondary contributor logically does not endorse a political speaker or the speaker's message by funding a primary contributor.

That the panel's rationale would permit such increasingly onerous disclosures should have given our court

pause. The panel decision in this case may only immediately curtail the First Amendment rights of San Franciscans, but its reasoning threatens vital constitutional protections for citizens in the entire Ninth Circuit. We should have granted rehearing en banc.